*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

SHAREE MILLER,

        *Petitioner-Appellee,*

    *v.*

      No. 08-2267

CLARICE STOVALL, Warden,

        *Respondent-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-73447—Victoria A. Roberts, District Judge.

Argued: October 15, 2009

Decided and Filed: June 22, 2010

Before: BOGGS, MOORE, and GIBSON, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Mark G. Sands, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Kimberly Thomas, UNIVERSITY OF MICHIGAN, MICHIGAN CLINICAL LAW PROGRAM, Ann Arbor, Michigan, for Appellee. **ON BRIEF:** Mark G. Sands, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Kimberly Thomas, Bridget M. McCormack, UNIVERSITY OF MICHIGAN, MICHIGAN CLINICAL LAW PROGRAM, Ann Arbor, Michigan, for Appellee.

    MOORE, J., delivered the opinion of the court, in which GIBSON, J., joined. BOGGS, J. (pp. 19-35), delivered a separate dissenting opinion.

_____

[*] The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   The State of Michigan ("State") appeals the district court's conditional grant of a writ of habeas corpus to prisoner Sharee Miller ("Miller"), who is currently serving a life sentence for second-degree murder and conspiracy to commit first-degree murder.   A jury found Miller responsible for the death of her husband after her lover, who allegedly pulled the trigger, committed suicide and left evidence implicating her in the crime.   The district court held that Miller's Sixth Amendment Confrontation Clause rights were violated by the admission at trial of the lover's suicide note, which stated that Miller "was involved and helped set it up."   On review, we conclude that the suicide note was testimonial, that its admission violated the Confrontation Clause, and that the State waived harmless-error review.   Accordingly, we **AFFIRM** the district court's judgment and **REMAND** to the district court for further proceedings consistent with this opinion.

**I.  BACKGROUND**

Miller married Bruce Miller ("Bruce") in April 1999.   Three months later, she met Jerry Cassaday, an ex-police officer, on a trip to Reno and began having an affair with him.   From June to November of that year, Miller (in Flint, Michigan) and Cassaday (first in Nevada, then in Missouri) communicated extensively over email and through instant messages ("IMs") and at times met in person.   Miller sent Cassaday a number of pornographic photos and an X-rated video of herself.   She told him tall tales, stating that her husband abused her and that his mob connections made it impossible for her to get help.   Twice, she said, she had become pregnant by Cassaday, once with twins. (In fact, Miller had a tubal ligation in 1995.)   She claimed that Bruce forced miscarriages both times, first by beating her and then by raping her and hiring someone else to rape her.

On November 7, 1999, Cassaday told his brother Mike that he was leaving town and that if he did not return in a couple of days, Mike should look for a briefcase under Cassaday's bed. On November 8, 1999, Bruce was found dead in his office in Flint, Michigan at 9:00 p.m., having been shot at close range with a shotgun between 6:20 p.m. and 7:13 p.m. By December 1999, Miller had stopped seeing Cassaday, rebuffed his proposals of marriage, and started dating someone else. Cassaday grew more and more depressed, although the reasons appear mixed: he had long struggled with alcohol and drugs, he had recently been arrested twice and lost custody of his son, and his family feared he was suicidal. On February 11, 2000, Cassaday shot and killed himself in his bedroom.

While cleaning up a few days later, Mike found a briefcase with four sealed envelopes placed on top of it under Cassaday's bed. Joint Appendix ("J.A.") at 415. The first envelope, taped to the briefcase, was addressed to an attorney and bore in Cassaday's handwriting the instruction, "Mike, do not open alone." *Id.* The briefcase turned out to contain a nine-page printout, marked by hand with the date of the night before the murder, of an IM conversation between Cassaday and Miller. The printout purportedly revealed that the two had planned Bruce's murder. Investigators found that several details from the IMs matched the events surrounding the killing, though Miller claims these were all publicly reported. The briefcase also contained computer disks with the images Miller had sent to Cassaday. The other three envelopes found on top of the briefcase were addressed to Cassaday's son, ex-wife, and parents. The letter to his parents (the "suicide note") explained his relationship with Miller, the duo's plot to kill Bruce, and Cassaday's decision to commit suicide rather than go to prison. It stated, "I drove there and killed him. Sharee was involved and helped set it up. I have all the proof and I'm sending it to the police. She will get what is coming." *Id.* at 420. Cassaday wrote that Miller had manipulated him and that "she is soon to learn that she can't do that to people." *Id.* Police also recovered emails from Cassaday's computer documenting the stories Miller had told him. They did not find an electronic copy of the IM conversation, which could have been saved to the computer's hard drive.

Prosecutors charged Miller with Bruce's murder. The trial court admitted the photographs, emails, IMs, and suicide note into evidence. Miller testified that she did not believe Cassaday murdered Bruce and pointed to an alternative suspect. She produced evidence that one of Bruce's business partners, John Hutchinson, had threatened to "dispose of" Bruce because of a criminal investigation involving both of them and a dispute over a loan, *id.* at 1260; that Hutchinson told his brother at 7:00 p.m. the night of the murder that he had "disposed of Bruce," *id.* at 1255; that Hutchinson was not home between some time after 5:00 p.m. and 7:30 p.m. that night; and that Hutchinson's step-son told police that Hutchinson acted "strange" upon returning that night, *id.* at 1214–15. On December 22, 2000, the jury convicted Miller of second-degree murder and conspiracy to commit first-degree murder. She received a life sentence.

The Michigan Court of Appeals affirmed the conviction, rejecting Miller's claims that the admission of various hearsay testimony violated the Confrontation Clause. *People v. Miller*, No. 233018, 2003 WL 21465338 (Mich. Ct. App. June 24, 2003). The Michigan Supreme Court denied leave to appeal on April 1, 2004, and denied a motion to reconsider on June 30, 2004.

Miller filed a federal habeas petition on September 7, 2005. A magistrate judge recommended that the district court rule that the suicide note's admission violated the Confrontation Clause but that it was harmless error; that the IMs were not testimonial and did not implicate the Constitution; that Cassaday's instructions to Mike were not statements under hearsay doctrine; and that the emails, video, and photos were not so prejudicial as to have violated Miller's right to a fair trial. The district court adopted the recommendations, except as to the harmlessness of admitting the suicide note. Finding that the State had waived the argument and that the error was not harmless, the district judge conditionally granted the writ. *Miller v. Stovall*, 573 F. Supp. 2d 964, 983 (E.D. Mich. 2008). The State timely appealed.

## II. ANALYSIS

The State makes three arguments against habeas relief: (1) the suicide note was not "testimonial," meaning that it did not implicate the Confrontation Clause; (2) the district court erred in finding that the State had waived any harmless-error argument; and (3) any constitutional violation was harmless error.

### A. Confrontation Clause

#### 1. Standard of Review

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend VI. This right is incorporated against the states through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 406 (1965). For over twenty years, courts analyzed confrontation challenges using *Ohio v. Roberts*, 448 U.S. 56 (1980), under which hearsay statements were admissible so long as they bore sufficient "indicia of reliability," that is, if they fell into a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Id.* at 66. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court revised its understanding of the confrontation right.[1] The Court held that if a hearsay statement is testimonial, it can be admitted against a criminal defendant only if the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine the declarant. *Id.* at 59. Although the Court left unanswered whether *Roberts* still governed nontestimonial hearsay, *id.* at 68, it later held that the Confrontation Clause did not apply at all to such statements, abrogating *Roberts* in full, *see Davis v. Washington*, 547 U.S. 813, 821 (2006).

---

[1]The Supreme Court decided *Crawford* on March 8, 2004, while Miller's application for leave to appeal was pending before the Michigan Supreme Court. The Michigan Supreme Court denied leave on April 1, 2004. Miller then moved for reconsideration, bringing the *Crawford* decision to the court's attention. The Michigan Supreme Court denied the motion for reconsideration on June 30, 2004, and Miller's conviction became final ninety days later on September 28, 2004. In *Whorton v. Bockting*, 549 U.S. 406 (2007), the Supreme Court held that *Crawford* was not retroactive on collateral review; however, *Crawford* governs here because a new rule applies to cases that are still on direct review when it is announced. *Bockting*, 549 U.S. at 416–17.

We review a district court's habeas ruling de novo. *Souter v. Jones*, 395 F.3d 577, 584 (6th Cir. 2005). On collateral review, the amount of deference paid to a state court varies based on the nature of that court's ruling. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), when a state court adjudicates a claim on the merits, a federal court can grant the writ only if the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state-court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Terry Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision is an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* When the state court does not address the merits of a claim, AEDPA deference does not apply and a federal court reviews the petitioner's legal claim de novo. *Maples v. Stegall*, 340 F.3d 433, 436–37 (6th Cir. 2003) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

In the instant case, the Michigan Court of Appeals resolved Miller's Confrontation Clause claim on the merits, but it did so under *Roberts*, then good law, rather than *Crawford*, which replaced *Roberts* as the governing standard while Miller's direct appeal was still pending before the Michigan Supreme Court. We must determine, then, whether to review Miller's claim under the law prevailing at the time of the state appellate decision or the law prevailing at the time Miller's conviction became final. The Second Circuit has discussed the Supreme Court's conflicting guidance on this question:

> In [*Terry*] *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), Justice Stevens, writing for a majority of the court,

> stated: "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established *at the time his state-court conviction became final*." *Id.* at 390, 120 S. Ct. 1495 (Stevens, J., for the court) (emphasis added). In a separate opinion, Justice O'Connor, also writing for a majority of the court, stated that the phrase "clearly established Federal law, as determined by the Supreme Court" refers "to the holdings, as opposed to the dicta, of this Court's decisions *as of the time of the relevant state-court decision*." *Id.* at 412, 120 S. Ct. 1495 (O'Connor, J., for the court) (emphasis added).

*Brown v. Greiner*, 409 F.3d 523, 533 n.3 (2d Cir. 2005). Typically, this distinction in language will be immaterial. Where, as here, the law changes after a state court rules on a petitioner's claim but before her conviction becomes final, it may be critical. The Supreme Court has never confronted this issue. It has cited Justice O'Connor's language in cases since *Terry Williams*, *see, e.g.*, *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004); *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003), but those cases did not involve changes in the governing law between the issuance of the state-court merits decision and the conviction becoming final.

We conclude that when the governing law changes between a state court's ruling and the date on which a petitioner's conviction became final, a federal habeas court reviewing the state-court judgment must apply the law that controlled "at the time his state-court conviction became final." *Terry Williams*, 529 U.S. at 390. At least four reasons support our conclusion. First, Justice O'Connor joined the part of Justice Stevens's opinion in which he stated that a rule applies on habeas review if it was "clearly established at the time his state-court conviction became final," *Terry Williams*, 529 U.S. at 367, 390. Second, as the magistrate judge in this case noted, immediately after articulating the standard in her opinion, Justice O'Connor remarked that "whatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1)."**[2]** *Id.* at 412. Under *Teague v. Lane*, a rule is "old" and applies on

---

**[2]**Contrary to the dissent's representation, Judge Merritt did not observe in *Davis v. Straub*, 430 F.3d 281 (6th Cir. 2005), that "Justice O'Connor was not discussing *Teague*'s *temporal* aspect in this passage." Dissent at 25. Judge Merritt did not discuss the timing issue at all, and his belief that "clearly established" law under AEDPA tracked "old rules" under *Teague* in terms of the generality of the rule did

collateral review if it was in place by the time a petitioner's conviction became final. *Teague*, 489 U.S. 288, 301 (1989) (O'Connor, J.) ("[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final."); *Beard v. Banks*, 542 U.S. 406, 411 (2004); *Wright v. West*, 505 U.S. 277, 304 (1992) (O'Connor, J., concurring in the judgment). Taken together, these two observations suggest that by "relevant state-court decision," Justice O'Connor may have meant a state-court decision rendered at a time at which the law required what it required when the conviction became final. In that case, the "relevant state-court decision" here would be the Michigan Supreme Court's denial of leave to appeal or its denial of Miller's motion for reconsideration; neither provided an adjudication of Miller's *Crawford* claim on the merits, so we would review the claim de novo. At the very least, these observations suggest that Justice O'Connor did not anticipate that the law applied by an intermediate court resolving the claim might differ from the law governing when the defendant's conviction becomes final.

Third, reading Justice O'Connor's opinion in *Terry Williams* as limiting federal habeas courts to the law applicable at the time of the intermediate state court's decision puts AEDPA and *Teague* in unintended conflict. "[T]he AEDPA and *Teague* inquiries are distinct." *Horn v. Banks*, 536 U.S. 266, 272 (2002). *Teague* bears on the law that applies on habeas review; as Justice O'Connor points out in *Terry Williams*, AEDPA imposes a more deferential standard of review in some circumstances, but the statute does not alter the applicable law except insofar as it "restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Terry Williams*, 529 U.S. at 407–09, 412; *see also id.* at 379 (Stevens, J.) ("The antiretroactivity rule recognized in *Teague*, which prohibits reliance on 'new rules,' is the functional equivalent of a statutory provision commanding exclusive reliance on 'clearly established law.'"); *Danforth v. Minnesota*, 128 S. Ct. 1029, 1058 (2008) (Roberts, C.J., dissenting) (explaining that AEDPA "has no bearing on our decisions about whether new or old law should apply in a particular case"); *Allen v. Ornoski*, 435 F.3d 946, 955 (9th Cir. 2006)

---

not prevent him from believing that AEDPA tracked *Teague* with regard to timing, as well.

("The Supreme Court has adopted the definition of new law fashioned in *Teague* . . . to determine what qualifies as clearly established law under AEDPA."). That is, it would seem to contravene both Justice O'Connor's and Justice Stevens's opinions in *Terry Williams* to hold that AEDPA departs from *Teague*'s emphasis on the point at which a petitioner's conviction becomes final. One judge in this circuit has already counseled against such an approach. *See Fulcher v. Motley*, 444 F.3d 791, 821–22 (6th Cir. 2006) (Clay, J., concurring) (reasoning that AEDPA does not independently preclude application of a Supreme Court case that would be retroactive under *Teague*).[3]

Fourth, the principles of comity, finality, and federalism do not require us to conclude otherwise, especially when, as in this case, the petitioner provided the state courts an opportunity to decide the constitutional claim in light of the change in the governing law.[4] Indeed, a contrary approach would allow a state supreme court—by denying review on a basis other than the merits despite being notified of the change in law—to insulate lower state-court judgments from meaningful review and deny defendants the benefit of doctrinal changes to which they are generally entitled on direct

---

[3] The dissent states that the Eleventh Circuit has decided this issue differently. In *Newland v. Hall*, 527 F.3d 1162, 1198–1201 & nn.62-64 (11th Cir. 2008), Judge Tjoflat defined "the relevant state court decision as the decision on the merits of the claim" and noted the consequence "that AEDPA may in some cases restrict the scope of our review even further than *Teague*." *Id.* at 1200 n.64. That part of the opinion, however, was not joined by the other two panel members and thus is not the law of the circuit; Judge Tjoflat spoke only for himself.

Interestingly, Judge Tjoflat read AEDPA as requiring habeas courts to apply the law as of the time of the state-court merits decision, not as of the time the conviction became final, but nonetheless ruled out any benefit this might confer on defendants whose final state-court adjudications occur on postconviction review after a new rule is announced. *See id.* at 1199 n.63 (assuaging the Fifth Circuit's concern in *Williams v. Cain*, 229 F.3d 468, 475 n.6 (5th Cir. 2009), that this interpretation would expand defendants' rights by clarifying that "[t]he independent application of the *Teague* analysis will still prevent the application of any new rule established after a petitioner's conviction becomes final on direct appeal, regardless of our definition of the relevant state court proceedings"). Judge Tjoflat treated AEDPA, insofar as it modifies *Teague*, as a one-way ratchet. On this view, AEDPA trumps *Teague* when the state-court merits decision and the change in the law both occur before the conviction becomes final but the merits decision comes first, but *Teague* trumps AEDPA when the merits decision occurs on postconviction review, even if the state court applies the new rule. Such an interpretation depends on the selective invocation of the principles of comity and federalism and a failure to follow them to their logical end.

[4] The dissent faults Miller for failing to seek certiorari because a petition to the Supreme Court "could well have resolved the matter by requiring the state court to confront the new law directly." Dissent at 23 n.2. That is a peculiar reproach. Had Miller sought certiorari, the Court would have remanded her case for reconsideration in light of *Crawford*, giving the state court *precisely* the same opportunity Miller herself created by filing for reconsideration in light of *Crawford*. Her decision to seek reconsideration by the Michigan Supreme Court rather than file a petition for a writ of certiorari in the U.S. Supreme Court therefore is not a reason to review the Confrontation Clause claim under *Roberts*.

review. *See Griffith v. Kentucky*, 479 U.S. 314, 321–22 (1987); *Bell v. Maryland*, 378 U.S. 226, 232 (1964).

We therefore hold that Miller's claim is governed by *Crawford*, not *Roberts*. This approach is consistent with our description of the habeas inquiry as "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 317–18 (6th Cir. 2001).

We turn next to whether we ought to defer to the state court's judgment under AEDPA. Notwithstanding the district court's statement to the contrary,[5] no state court ever decided the key issue upon which this case turns: whether the suicide note is testimonial. Given this procedural posture, AEDPA deference to the state courts is inappropriate because there is simply no analysis or conclusion on the central legal question to which to defer. *See Wiggins*, 539 U.S. at 534 (holding that the Court's review of a claim of ineffective assistance of counsel "is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis").

At oral argument, it was suggested that the instant case is distinguishable from *Wiggins* because there the state courts failed to reach a particular issue (whether an attorney's deficient performance prejudiced a defendant) whereas here the state court did decide the legal issue (whether the Confrontation Clause was violated). The proposal is that we defer to the state court's ultimate *conclusion* on the Confrontation Clause claim. We submit that the instant case is in fact similar to *Wiggins* in that in both cases a state court ruled on the merits of a *claim* without resolving the pivotal legal *issue* on which that claim ultimately turned. More importantly, it is not coherent to defer to a state-court conclusion when the state court applied an analytical framework that has been explicitly overruled and that does not apply to this case. Congress enacted AEDPA deference "to further the principles of comity, finality, and federalism." *Michael*

---

[5]*See Miller*, 573 F. Supp. 2d at 977 (stating that the state court "unreasonably found that the suicide note was not testimonial").

*Williams v. Taylor*, 529 U.S. 420, 436 (2000). While echoing the denial of relief would close the case, it serves neither comity nor federalism to defer to a conclusion made on an inapposite legal question.[6] Moreover, it would *disserve* comity should we be required to label the state court's decision an unreasonable application of law it never had occasion to apply. Finally, de novo consideration seems particularly appropriate given that the Michigan Supreme Court denied leave to appeal and reconsideration despite Miller's alerting it to the *Crawford* decision while her direct appeal was pending.[7]

### 2. Under *Crawford*, the Suicide Note Was Testimonial

There is no dispute that Cassaday was unavailable at trial or that Miller never had the opportunity to cross-examine him. The only issue is whether the suicide note was testimonial.

In *Crawford*, the Supreme Court declined to "spell out a comprehensive definition of 'testimonial.'" 541 U.S. at 68. It began at the extremes, noting that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 51. It then listed three "formulations of th[e] core class of testimonial statements," drawn from court filings and a previous case:

---

[6]In a separate line of cases, we have applied "modified AEDPA deference" when the state court adjudicates a claim without articulating its reasoning or with little analysis. This standard requires a federal court "to conduct a careful review of the record and applicable law, but nonetheless bars the court from reversing unless the state court's decision is contrary to or an unreasonable application of federal law." *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005); *see also Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005). The dissent would apply this standard. It could be questioned whether this court took a wrong turn in concocting modified AEDPA deference, as the standard looks indistinguishable from regular AEDPA deference and rests on a fiction about the state court's analysis. But if modified AEDPA deference makes any sense, it is only because we assume that the state court considered the issues with which it was confronted. Such an assumption would be completely unfounded when, as in this case, the state court does not simply render a decision without adequate explanation but instead actively applies a legal standard that no longer governs. *See Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001) ("[W]e can hardly defer to the state court on an issue that the state court did not address.").

[7]The dissent's first preference is that we apply *Roberts* and afford AEDPA deference to the Michigan Court of Appeals's denial of Miller's claim. For the reasons described above, we disagree and apply *Crawford*. Seeing this, the dissent likewise analyzes the state-court decision under *Crawford*, and yet it applies AEDPA deference. This approach directly contravenes the Supreme Court's guidance in *Terry Williams* that "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Terry Williams*, 529 U.S. at 405. If *Crawford* applies, we are "unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause," and our review is de novo. *Id.* at 406.

> [(1)] "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; [(2)] "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois*, 502 U.S. 346, 365 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); [(3)] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 3.

*Id.* at 51-52. The Court noted that "all share a common nucleus." *Id.* at 52. It also declared that testimony at a preliminary hearing, grand jury proceeding, or former trial and statements in police interrogations are testimonial under any definition, *id.* at 52, 68, and that business records and statements in furtherance of a conspiracy are nontestimonial "by their nature," *id.* at 56.

In *Davis v. Washington*, 547 U.S. 813 (2006), the Court delivered a refined definition of "testimonial," but only for a subset of cases involving police interrogation.[8] The Court explicitly cautioned that it did not mean "to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial," because the Framers did not intend "to exempt from cross-examination volunteered testimony or answers to open-ended questions." *Id.* at 822 n.1. In its most recent case on the Confrontation Clause, the Court appeared to discuss the three formulations as more than merely possible definitions. *See Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2531 (2009) (stating that in listing the three formulations, *Crawford* "described the class of testimonial statements covered by the Confrontation Clause"); *id.* at 2532 (in holding that drug-analysis certificates are testimonial, noting that "[o]ur description of [the core class of testimonial statements] mentions affidavits twice").

---

[8]"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822.

The Sixth Circuit has adopted a standard for applying the Supreme Court's ruling in *Crawford*. In *United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004), this court offered the following guidance for determining whether a statement is testimonial:

> The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.

*Id.* at 675; *see also United States v. Hinton*, 423 F.3d 355, 359–60 (3d Cir. 2005) (adopting the *Cromer* standard). Applying this standard, we held that a confidential informant's statements to a police officer, relating the name identification and physical description of the defendant, were testimonial. *Id.* at 677-79. This court has consistently applied the *Cromer* standard. *See, e.g.*, *United States v. Mooneyham*, 473 F.3d 280, 286–87 (6th Cir. 2007) (co-conspirator's statements to undercover police officer were not testimonial because he would not have believed they would be used at trial); *United States v. Johnson*, 440 F.3d 832, 843 (6th Cir. 2006) (statement to twenty-five-year acquaintance was not testimonial when declarant had no reason to suspect acquaintance's cooperation with law enforcement); *United States v. Barry-Scott*, 251 F. App'x 983, 989–90 (6th Cir. 2007) (unpublished opinion) (confidential informant's statements to police officer were testimonial).

In the proceedings below, neither the magistrate judge nor the district judge relied on *Cromer*. Instead, the magistrate judge, whose reasoning the district judge apparently adopted, concluded that the suicide note was testimonial based on the second and third formulations suggested in *Crawford*: it was a confession, and it was made in circumstances in which an "objective witness" would expect it to be used at trial. *Miller*, 573 F. Supp. 2d at 977, 983, 993-94. As to the former ground, the State argues that *Crawford* requires confessions to be "formalized," that is, made to the police or some other state official, to be testimonial. Miller responds that the fact that the note was written by a former police officer, typed, signed, and placed in a sealed envelope made it formalized enough. The parties' debate demonstrates why the *Cromer* standard is

more useful than a bright-line rule about confessions:  the question of how formal a confession must be to be testimonial turns on what level of formality would lead a reasonable person to expect the confession to be used in investigation or prosecution. Thus, we decline to decide the confession issue and move directly to the district court's reliance on the third *Crawford* formulation, which is roughly the same as the *Cromer* standard.

In analyzing whether a reasonable person would expect the suicide note to be used at trial, the magistrate judge appears to have misstated the operative facts.  The magistrate judge wrote, Cassaday "clearly intended for his letter to be found, a chain of evidence preserved (that is, through his instructions to his brother) and for the letter to be used as evidence against petitioner.  He states his intention in the note itself, and planned in advance for his brother to find the letter and deliver it to authorities." *Id.* at 994.  These statements confuse the suicide note with the other materials that Cassaday left for his brother.  The suicide note was addressed to Cassaday's parents, was found on top of the briefcase, and contained no explicit instructions to preserve its authenticity or facilitate its delivery to law enforcement.  It stated, "I have all the proof and I'm sending it to the police," J.A. at 420, but this statement appears to refer to the IM transcript and computer disks in the briefcase, not to the note itself.

Nonetheless, the magistrate judge, and the district judge in adopting the magistrate judge's recommendation, correctly concluded that the note was testimonial. Under *Cromer*, in light of everything else that Cassaday, a former police officer, did to prepare the case against Miller, "a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Cromer*, 389 F.3d at 675.  Because Cassaday took care to assemble, preserve, and arrange delivery to the police of the IM printout and disk images, and because the suicide note was placed atop the briefcase and contained a direct accusation of Miller, J.A. at 415, 420, it was foreseeable that the authorities would use the note against her.  On this basis, the suicide note was testimonial, and its use violated Miller's Sixth Amendment rights.

The State provides three reasons that we should decide differently. First, the State argues that the suicide note was found outside rather than inside the briefcase, indicating that Cassaday did not intend it to be part of the materials that would be opened by his lawyer and turned over to the police. Second, the State contends that Cassaday's statement that he was sending "all the proof" to the police most likely refers to the materials in the briefcase and indicates that he did not also intend the police to obtain the suicide note. And third, the State asserts that the note is merely a son's explanation to his parents of why he took his own life, not a set of statements that Cassaday may have anticipated would be used at trial.

All three arguments deflect the *Cromer* reasonable-expectation test and depend on inferences about Cassaday's actual intent based on the physical evidence. It is possible that, by leaving the suicide note outside the briefcase, Cassaday did not intend that the note reach the authorities. But Cassaday placed the suicide note directly on top of the briefcase, and it is equally possible that he saw the materials collectively as a parcel that could be used against Miller. Cassaday also had an interest in preserving the impression, accurate or not, that he had assembled the materials in the briefcase in November, just before the murder; he may have felt that adding the suicide note to the briefcase three months later could call into question the integrity of its other contents. Furthermore, the fact that Cassaday indicated that he was sending other materials to the police does not rule out that he hoped that the note would reach them as well. Nor does the fact that the note's contents are directed to his mother and father contradict an intent that the police ultimately obtain access to the note. Human beings often act with multiple motives. Cassaday may have intended the letter both as an apology to his parents and as an indictment from the grave of his alleged co-conspirator. In that case, it would be reasonable to leave the letter outside the briefcase so that his parents would receive it, and receive it from him, rather than from investigators only after it had been logged into evidence.

The possibilities are several. The point is not that these scenarios are more likely than that envisioned by the State, but rather that it is difficult to divine actual intent in

this case. Under these circumstances, we are on more stable ground applying *Cromer*'s reasonable-expectation test.[9] The suicide note includes incriminating information that no other evidence provides: whereas the IMs merely attest to the planning, the note confesses that Cassaday, not a third party, actually completed the murder. Any reasonable person, particularly one with Cassaday's training, who prepared the briefcase would anticipate the prosecutorial importance of a letter declaring "I drove there and killed him" and "Sharee was involved and helped set it up." J.A. at 420. Clearly, the suicide note would be passed on to law enforcement.

For these reasons, we conclude on de novo review that the suicide note is testimonial and its admission at trial constituted constitutional error.

## B.  The State Waived Its Harmless-Error Argument

Confrontation Clause violations are subject to harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 682 (1986). Here, the district court held that the State waived any harmless error argument by failing to make the argument in its briefing as to the suicide note, even while raising the issue as to the IMs. A different panel of this court has previously raised but declined to resolve the issue of whether this type of omission constitutes waiver. *See Calvert v. Wilson*, 288 F.3d 823, 832 n.1 (6th Cir. 2002) (declining to rule on petitioner's argument that the State "waived the harmless error issue by raising it in a footnote [in the Return of Writ] without discussion or citation to authority" because petitioner was "entitled to relief whether [the State] waived the harmless error issue or not"); *id.* at 835–36 (Cole, J., concurring) (contending that the State's harmless-error argument, which was not raised at the district court, should

---

[9]The dissent misses this point when it raises its trio of note-destruction hypotheticals. A person who writes a suicide note and then throws it into the trash, tears it up, or completely destroys it manifests actual intent *not* "to bear testimony against the accused." *Cromer*, 389 F.3d at 675. On those facts, we would not need to employ *Cromer*'s objective test. Here, however, there is insufficient independent evidence of Cassaday's actual intent: he may have seen the suicide note as completely separate from the briefcase materials or as part and parcel of them.

Nor is our analysis thwarted by the mathematical imprecision of the word "anticipate." Even on the dissent's definition of "a significant likelihood, though perhaps short of 50%," Dissent at 28 n.7, we believe a reasonable person in Cassaday's position would have anticipated that a suicide note confessing to actually committing the murder and implicating Miller, left atop a briefcase of accusatory evidence gift-wrapped for the police, would be used against Miller.

not be reviewed because "the warden bear[s] the responsibility of ensuring all defenses, including harmless error, are timely raised").

Joining other courts that have considered the question, we now hold that a State waives harmless error when it fails to raise the issue in its response to the habeas petition in federal district court. *Sanders v. Cotton*, 398 F.3d 572, 582 (7th Cir. 2005) (holding that by not making it in the district court, the State waived its argument on appeal that any jury-instruction error was harmless); *Lam v. Kelchner*, 304 F.3d 256, 269–70 (3d Cir. 2002) (holding that the Commonwealth's harmless-error argument in a habeas case "was never raised before the District Court and was therefore waived," and noting that "the Commonwealth admits waiver"); *Gabow v. Deuth*, 302 F. Supp. 2d 687, 706–07 (W.D. Ky. 2004) (finding harmless error waived when neither the State's answer nor its memorandum asserted the defense); Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 31.2a (5th ed. 2005) ("Like other defenses to habeas corpus relief, the 'harmless error' obstacle does not arise unless the state asserts it; the state's failure to do so in a timely and unequivocal fashion waives the defense."). We therefore hold that the district court correctly concluded that the State waived any harmless-error argument.

Somewhat half-heartedly, the State challenges this finding, noting that the cases relied on by the district court involve express waiver. *E.g.*, *Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (unpublished opinion) (state checked box indicating no harmless-error argument). The State cites no cases, however, for the proposition that waiver of harmless error *must* be express, and this circuit's case law indicates that harmless error can be waived even by "relying on . . . a perfunctory discussion." *United States v. Johnson*, 467 F.3d 559, 564 (6th Cir. 2006).[10]

---

[10]The dissent criticizes our citation of *Johnson* as inapt because that case involved an inadequate harmless-error argument made at the appellate level. We do not intend to say, however, that the State waived its argument due to inadequate briefing. Rather, the point is that given that inadequate briefing is enough to trigger waiver, certainly *failure to raise an argument at all* triggers waiver. The State's failing is all the more egregious because it occurred below. *See United States v. Abdi*, 463 F.3d 547, 563 (6th Cir. 2006) ("It is fundamental, and firmly established by Supreme Court precedent, that appellate courts generally are not to consider an issue brought for the first time on appeal."). We see no reason, and the dissent provides none, why the general rule that failure to raise an issue below constitutes waiver should not apply to the respondent in a habeas case under § 2254. Moreover, we reject the dissent's contention

Finally, the State urges us to conduct harmless-error review sua sponte. We have no obligation in this regard but may do so in our discretion. *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004). In light of the State's decision not to raise this argument to the district court despite having every reason to do so, we decline to reach the issue. *See id.* Because we hold that the State waived harmless-error review, the writ must issue.[11]

### III.  CONCLUSION

Cassaday's suicide note, confessing to Miller's husband's murder and accusing Miller of conspiring in the crime, was testimonial under *Crawford* because a reasonable person in Cassaday's position would have anticipated its use by authorities in investigating and prosecuting Miller. Its introduction at trial violated Miller's confrontation rights under the Sixth Amendment. Because the State waived the harmless-error argument, we **AFFIRM** the district court's judgment conditionally granting the writ of habeas corpus and **REMAND** to the district court for further proceedings consistent with this opinion.

---

that the State raised harmlessness as to the suicide note by raising it as to the IMs. The harmless-error analysis would have differed with respect to each piece of evidence because each piece presented different information, was subject to a different level of impeachment, and played a different role in the State's case. And if anything, the fact that the State had the wherewithal to raise harmlessness as to one piece of evidence gives rise to a fair inference that the State intended to waive the issue as to the other. *United States v. Olano*, 507 U.S. 725, 733 (1993) ("[W]aiver is the intentional relinquishment or abandonment of a known right." (internal quotation marks omitted)). Thus, while Miller herself argued that the Confrontation Clause error was not harmless in her reply to the State's answer as a prophylactic measure, the district court had every reason to believe that the State had elected not to argue harmless error with regard to the suicide note.

[11]Were we to indulge the State's request, we would be hard pressed to see the prosecution's use of the suicide note in violation of the Confrontation Clause as harmless to the jury's findings of guilt beyond a reasonable doubt. In particular, we find it significant that the prosecution relied heavily on the suicide note, invoking it during closing arguments to dispel the notion that Hutchinson may have killed Bruce Miller: "Now there has been some indication that . . . Jerry isn't the one who killed Bruce. *That's where the suicide note comes in. . . . Do not take the suicide note lightly.*" J.A. at 1442 (emphases added). And critically, the trial court admitted the note pursuant to the residual hearsay exception, under which evidence must be "more probative on the point for which it is offered than any other evidence which the proponent could procure through reasonable efforts." Mich. R. Evid. 804(b)(7); *see also Dorchy v. Jones*, 398 F.3d 783, 791 (6th Cir. 2005) (invocation of the exception "makes the state's present argument that [the] testimony was insubstantial both unpersuasive and inconsistent"). Under *Dorchy*, this evidentiary ruling would give us grave doubt that the suicide note's admission was harmless. *See Stapleton v. Wolfe*, 288 F.3d 863, 867 (6th Cir. 2002).

———————————

**DISSENT**

———————————

BOGGS, Circuit Judge, dissenting.  This case presents a tangled web of factual circumstances worthy of a soap opera, AEDPA procedural complications arising from a coincidence of timing, and interesting and important Sixth Amendment constitutional law.  Despite the majority's lucid analysis, I would hold that the Michigan courts' *ultimate conclusion* – that the admission of Cassaday's suicide note to his parents did not violate the Confrontation Clause – is both correct, and a fortiori, not an "unreasonable application" of Supreme Court precedent.  I would also hold that the state did not waive harmless-error review, and that even if it did, we should exercise our discretion to review for harmlessness sua sponte.  Finally, I would hold that the overwhelming evidence that was properly admitted rendered any hypothetical error harmless.  I therefore respectfully dissent.

## I.  Applicability of AEDPA Deference

The majority holds that AEDPA deference does not apply here, and that we are free to consider Miller's Confrontation Clause claim de novo using outcome-determinative legal principles that were not available to the Michigan state courts at the time of Miller's trial and appeal.  I believe that the majority's interpretation of AEDPA skirts the statute's purposes of promoting deference to reasonably decided state-court decisions and respect for the states' interest in the finality of their own criminal convictions.

As an initial matter, this case presents a relatively rare situation. As the majority notes, the Michigan trial court correctly ruled the suicide note admissible under then-controlling Confrontation Clause jurisprudence.  In June 2003, the Michigan Court of Appeals issued a reasoned decision, also correct under the law as it stood at the time, affirming the trial court's Confrontation Clause analysis.  On March 8, 2004, after briefing had been completed in the Michigan Supreme Court, the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004), which effected a sea change

in Confrontation Clause doctrine.  The Michigan Supreme Court denied leave to appeal on April 1, 2004, which was entirely within its discretion, *see* Mich. Ct. R. 7.302; it also denied a motion to reconsider (in which C*rawford* was specifically brought to its attention) on June 30, 2004.  Miller did not apply to the United States Supreme Court for a writ of certiorari.

As the majority recognizes, we afford "modified AEDPA deference" whenever state courts adjudicate claims on the merits without articulating their reasoning.  *See, e.g.*, *Harris v. Stovall*, 212 F.3d 940, 943 & n.1 (6th Cir. 2000).  In such cases, "a habeas court [must] focus on the *result* of the state court's decision," *id.* at 943 n.1 (emphasis added), and "uphold the state court's summary decision unless [the habeas court's] independent review of the record and pertinent federal law persuades [it] that [the state court's] *result* contravenes or unreasonably applies clearly established federal law" as expressed in the holdings of the United States Supreme Court, *id.* at 944 (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1177-78 (10th Cir. 1999)) (emphasis added).  The majority does not dispute that the Michigan Court of Appeals's *result* – its finding of no Sixth Amendment violation under these circumstances – does not "contravene[] or unreasonably appl[y]" any United States Supreme Court holding.  Accordingly, in this case, had the Michigan Court of Appeals (or the Michigan Supreme Court in denying leave for appeal) simply said "we have considered Miller's Sixth Amendment claim" or "we have considered Miller's Confrontation Clause claim," and rejected it without further reasoning, we would be obliged to respect that *result*.

Nonetheless, here, even though the Michigan Court of Appeals took the extra step of explaining its reasoning, the majority holds that we now cannot give its decision any deference, even though that decision in fact correctly applied the law that governed at the time.  This result seems anomalous, and is not compelled by any of the cases cited by the majority.  *See Merced v. McGrath*, 426 F.3d 1076, 1081 (9th Cir. 2005) ("[I]t is the state court's decision, as opposed to its reasoning, that is judged under the 'unreasonable application' standard."); *Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001)

(stating that, in applying § 2254(d)(1), "we are determining the reasonableness of the state courts' 'decision,' not grading their papers.").

Further, it is not even clear that *Crawford* is relevant to the question of AEDPA deference. Under 28 U.S.C. § 2254(d)(1), state-court judgments are immune from attack on habeas unless they are "contrary to, or involved an unreasonable application of, *clearly established Federal law*, as determined by the Supreme Court of the United States." (emphasis added). In *Terry Williams v. Taylor*, one of the Supreme Court's seminal AEDPA cases, the Court made two contradictory statements as to the crucial time frame we must look to for determining what constitutes "clearly established Federal law." Justice O'Connor, writing for herself and four other justices, said that this phrase refers to "this Court's decisions *as of the time of the relevant state-court decision*." 529 U.S. 362, 412 (2000) (emphasis added); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (O'Connor, J.) (stating that "'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court *at the time the state court renders its decision*." (emphasis added)). However, Justice Stevens, writing for a different majority in *Terry Williams*, stated that AEDPA requires us to look to "law that was clearly established *at the time the state-court conviction became final*." 529 U.S. at 390 (emphasis added).

This disjunction has been little noted, perhaps because it is rare to have a situation such as the one we face here, where the relevant law changed between the two alternative times (and where the defendant did not seek certiorari, which would usually have resolved the matter). Our cases have cited the O'Connor formulation far more often than the Stevens formulation, although we appear not to have confronted a case up to this point where the formulation chosen would make a difference. The Eleventh Circuit has noted the contradiction and chosen to follow the O'Connor formulation, noting that the Supreme Court has cited it at least four times after *Williams*, while not

citing the Stevens formulation again.  *Newland v. Hall*, 527 F. 3d 1162, 1198 n.62 (11th Cir. 2008).[1]

> As the Supreme Court has explained in no uncertain terms,
>
> AEDPA's purpose [is] to further the principles of comity, finality, and federalism. There is no doubt Congress intended AEDPA to advance these doctrines. Federal habeas corpus principles must inform and shape the historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts. In keeping this delicate balance we have been careful to limit the scope of federal intrusion into state criminal adjudications and to safeguard the States' interest in the integrity of their criminal and collateral proceedings.

*Michael Williams v. Taylor*, 529 U.S. 420, 436 (2000).  Because our interference in a state criminal proceeding is a matter of considerable gravity, infringing on these "principles of comity, finality, and federalism," I would at least lean toward the O'Connor formulation, which requires that we defer unless the state court *actually committed error.  See Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998) ("[AEDPA] tells federal courts: Hands off, unless the judgment in place is *based on an error* grave enough to be called 'unreasonable.'" (emphasis added)).[2]

The majority opts for the Stevens formulation, primarily on the ground that it matches up with the temporal dividing line between "old rules" and "new rules" which the Supreme Court established in *Teague v. Lane*, 489 U.S. 288, 301 (1989) (stating that a rule of law is "old," and therefore applies on collateral review, if it was established by

---

[1]The majority points out that, while the relevant passage from the Eleventh Circuit's opinion in *Newland* appears in the leading opinion by Judge Tjoflat, Judge Anderson specifically declined to join in the portion of Judge Tjoflat's opinion in which this passage appears, and Judge Wilson concurred only in the result, such that the choice of Justice O'Connor's formulation over Justice Stevens's is not binding law in the Eleventh Circuit.  This, however, does not diminish the strength of Judge Tjoflat's analysis (which, in any event, would be at most persuasive authority in this circuit even if it *were* binding in the Eleventh). I also note that, while Judge Anderson did not join in that portion of Judge Tjoflat's opinion, he refrained from doing so only because he felt it unnecessary to reach the issue, not because he disagreed with Judge Tjoflat's analysis – in fact, he noted that he "th[ought it] very probably entirely accurate and sound." *Newland*, 527 F.3d at 1218 (Anderson, J., concurring).

[2]That choice is especially appropriate here, as Miller did not take the step of seeking certiorari, which could well have resolved the matter by requiring the state court to confront the new law directly. Many defendants in Miller's position who did seek certiorari in this time frame had their cases reversed and remanded to state court for consideration in light of *Crawford.  See, e.g.*, *Goff v. Ohio*, 541 U.S. 1083 (2004); *Siler v. Ohio*, 543 U.S. 1019 (2004).

the time a habeas petitioner's conviction became final). While this symmetry may be superficially pleasing, I see no a priori reason why the temporal divide between old and new rules for purposes of *Teague* must align with the relevant temporal divide for purposes of AEDPA. To the contrary, it makes perfect sense that the respective dividing lines should differ, for, as the majority acknowledges, the Supreme Court has observed that "[t]he AEDPA and *Teague* inquiries are distinct." Maj. Op. at 8 (quoting *Horn v. Banks*, 536 U.S. 266, 272 (2002)).[3]

The *Teague* inquiry is functional; it determines what law governs the merits of a petitioner's habeas claim. *See* Maj. Op. at 8. The *Teague* Court had to select a cutoff point to determine what rules would apply on habeas, and settled on the time at which a conviction becomes final, primarily because the Court felt that this was the point at which the systemic interest in "repose" and reliance on concluded litigation "outweigh[ed] . . . the [petitioner's] competing interest in readjudicating [his] conviction[] according to [newly declared] legal standards . . . ." 489 U.S. at 306 (quoting *Mackey v. United States*, 401 U.S. 667, 682-83 (1971) (Harlan, J., concurring in judgments in part and dissenting in part)).

AEDPA, by contrast, embodies Congress's desire to create an initial hurdle to be surmounted before the remedy of habeas becomes available at all. *See Uttecht v. Brown*, 551 U.S. 1, 10 (2007) ("The provisions of [AEDPA] create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings."); *Danforth v. Minnesota*, 552 U.S. 264, 309 (2008) (Roberts, C.J., dissenting) (noting that unlike the *Teague* inquiry, which determines "whether new or old law should apply in a particular case," AEDPA represents Congress's intent to "control . . . federal courts' ability to grant postconviction remedies"). In other words,

---

[3] *See also Crater v. Galaza*, 508 F.3d 1261, 1263 n.4 (9th Cir. 2007) ("[W]hereas under *Teague v. Lane* a constitutional principle [is] considered 'old' (i.e., clearly established) if it was recognized prior to the petitioner exhausting his direct appeals, under AEDPA a principle is clearly established only if it was recognized by the Supreme Court at the time of the petitioner's conviction." (internal citation omitted)); Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 32.3 (5th ed. 2001) ("[AEDPA's] choice-of-law rule is stricter than *Teague*'s in [that it] . . . limits federal review to legal rules that actually were in effect when the state court decided the case. The statute thus apparently abandons *Teague*'s application on habeas corpus of law announced after the state court decision but before certiorari proceedings in the Supreme Court were completed.").

by enacting AEDPA, Congress intended to superimpose an added layer of deference to *state-court decisions as such* – i.e., to "tell[] federal courts: Hands off, unless the judgment in place is based on [a state-court] error grave enough to be called 'unreasonable.'" *Herbert*, 160 F.3d at 1135.

The *Teague* inquiry does not share AEDPA's primary concern with fostering respect for state-court decisions and protecting "the States' interest [as against the federal government] in the integrity of their criminal and collateral proceedings." *Michael Williams*, 529 U.S. at 436. Thus, the majority's desire to match up the two inquiries' temporal dividing lines is misplaced. Rather, as stated previously, it is eminently reasonable that the AEDPA dividing line should be drawn so as not to penalize state courts for making *correct* decisions that merely fail to predict the future.

The majority correctly observes that in her opinion in *Terry Williams*, Justice O'Connor stated that "[w]ith [the] caveat [that the inquiry is restricted to the decisions of the *Supreme Court*], whatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law . . .' under [AEDPA]." 529 U.S. at 412. However, the majority reads too much into this statement. As one judge on this circuit has observed, Justice O'Connor was not discussing *Teague*'s *temporal* aspect in this passage, but rather, *Teague*'s approach to the proper *level of specificity* with which a "rule" must have been pronounced as of the relevant time to qualify as established:

> The Supreme Court has adopted the spectrum of abstraction of *Teague v. Lane* to determine whether a particular legal principle was clearly established at the relevant time. *See* [*Terry*] *Williams*, 529 U.S. at 412, 120 S. Ct. 1495 (With the caveat that the source of clearly established law is Supreme Court jurisprudence, "whatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law . . .' under § 2254(d)(1)."). At one end of the spectrum lie legal principles with such a high level of generality, like the Eighth Amendment principle of reliability in sentencing, whose application does not necessarily lead to a "predictable development" in the relevant law and therefore cannot be considered clearly established. On the other end are narrowly drawn bright-line rules with little application beyond factually indistinguishable situations. In the middle of the spectrum lie

those general principles of law crafted by the Supreme Court to constitute clearly established law in a wide range of factual situations.

*Davis v. Straub*, 430 F.3d 281, 292 (6th Cir. 2005) (Merritt, J., dissenting) (internal citations omitted).  In other words, it appears that all Justice O'Connor meant to imply with her comment was that a rule that had been announced at a sufficient level of specificity to qualify as "old" under *Teague* will also have been announced with a sufficient level of specificity to qualify as "clearly established" under AEDPA.  She was not, however, addressing the proper time frame for making this assessment.

For these reasons, I have serious doubts about the majority's adoption of the Stevens standard as the law of this circuit.  Even under the majority's timing rule, however, I would still accord the state court's *result* as to Miller's Confrontation Clause claim – i.e., the Michigan Court of Appeals's holding of no Sixth Amendment violation – the same degree of deference as we would afford it if that court had simply been silent as to its reasoning.

## II.  Merits of Confrontation Clause Claim

Having disposed of the issue of AEDPA deference, the majority examines Miller's Confrontation Clause claim de novo and finds it meritorious.  As I have stated, I would review Miller's claim applying AEDPA deference, and under that standard, I would find her claim without merit.  However, even under de novo review, I would find Miller's Confrontation Clause claim unpersuasive.

## A.  Applying AEDPA Deference

First, under AEDPA, we are constrained to inquire whether the state court decision is "contrary to" or an "unreasonable application of" Supreme Court precedent at the relevant juncture.  Even assuming arguendo that the relevant time frame is when Miller's conviction became final (i.e., applying the Stevens rule), Miller cannot meet this standard.  In *Crawford*, the Supreme Court established that "testimonial" hearsay from an unavailable witness violated the Confrontation Clause, but pointedly "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial.'"  541

U.S. at 68.  All that *Crawford* clearly established with respect to what constitutes "testimonial" hearsay is that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations" – i.e., "the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Ibid.*  While the *Crawford* Court listed various generalized definitions of "testimonial" proposed by the petitioner, an amicus, and a concurrence by Justice Thomas, it did not select among them; nor did it state that those were the only possible definitions.

The type of hearsay at issue here – a suicide note, in a sealed envelope, addressed to one's parents – was obviously not directly at issue in *Crawford*.  Nor does it fall into any of the classes of hearsay which the *Crawford* Court conclusively identified as "testimonial."  As for the Court's three *proposed* definitions of "testimonial," the suicide note qualifies under *at most* one (and even this is doubtful, as I discuss below) – "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52 (quoting Brief for Nat'l Ass'n of Criminal Defense Lawyers et al. as *Amici Curiae* at 3).  However, in light of the open-endedness of the Court's holding, it would not be an "unreasonable" application of *Crawford* to use one of the other two proposed definitions, or another definition entirely, under which the suicide note would not qualify.  Under AEDPA, our inquiry ends here.

## B.  Under De Novo Review

I believe that Miller's Confrontation Clause claim fares little better under de novo review.  Without the strictures of AEDPA, we are free to consider post-*Crawford* case law from both the Supreme Court and this court.  The only such decision directly on point is *United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004), in which a panel of this circuit adopted something close to one of the *Crawford* Court's several proposed definitions of "testimonial."  In *Cromer*, however, we said two somewhat contradictory things in direct succession.  We first said that the "proper inquiry . . . *is* whether the declarant intends to bear testimony against the accused."  389 F.3d at 675 (emphasis

added).  This sentence obviously focuses on the declarant's actual intent.  The very next sentence abandons the focus on subjective intent, stating that the intent "*may* be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime."  *Ibid.* (emphasis added).[4]  This second sentence resembles the *Crawford* Court's broadest proposed definition of "testimonial" statements (i.e., those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial"),[5] with the notable substitution of the still broader phrase "use[] . . . in investigating and prosecuting the crime" for the *Crawford* Court's phrase "use at . . . trial."[6]

The *Cromer* panel's standard leads immediately to a number of unanswered questions.  The first involves the multiple meanings of "intend" and "anticipate."  Cassaday obviously intended that his parents understand that his committing suicide had to do with the murder.  The majority places considerable emphasis on Cassaday's background as a police officer, and uses that to attempt to divine what he could "anticipate" might happen as a result of his note.  However, that very argument demonstrates the slipperiness of the term "anticipate."  Does that term mean that a reasonable declarant would believe it very likely that something will happen as a direct result of his actions?  Or only somewhat likely?  Or simply barely possible?[7]

---

[4] The majority appears to be inconsistent about whether this "may" actually means "must."  On one hand, the majority suggests that in situations where a declarant "manifests actual intent *not* 'to bear testimony against the accused,'" a court "would not need to employ *Cromer*'s objective test," and could look instead to the manifestations of subjective intent.  Maj. Op. at 16 n.9 (quoting *Cromer*, 389 F.3d at 675).  On the other hand, the majority faults the state's compelling arguments that the suicide note was not testimonial for "deflect[ing] the *Cromer* reasonable-expectation test and [instead] depend[ing] on inferences about Cassaday's actual intent based on the physical evidence."  Maj. Op. at 15.  It is entirely unclear when the majority would permit resort to inferences about actual intent and when it would not.

[5] Notably, this is a definition for whose provenance the Supreme Court cited only an amicus brief by an association of criminal defense lawyers.

[6] Surely there would be nothing unconstitutional in using the note, or suspicions derived from it, merely to *investigate* the crime.  What, then, does the presence of "investigating" legitimately add?

[7] Personally, I would interpret "anticipate" as requiring a significant likelihood, though perhaps short of 50%.

Consider, for example, a series of hypotheticals involving other possible iterations of Cassaday's suicide note. Suppose that the note had been written, but then thrown in the wastebasket. Certainly, as a police officer, Cassaday could "anticipate" that in the wake of his suicide (and the previous murder, to which he knew that suspicion would attach, at a minimum, as a result of his briefcase evidence), his house and trash might be searched by family or police. Or suppose he had written the note and then torn it into little pieces and left it in his briefcase (as occurred with the Vince Foster suicide note). Or suppose he had written the note on a pad but then completely destroyed the note, leaving, however, the impression of his words on the next page of the pad (which he did not destroy); as an officer, he would know of the means of recovering such "indented writing." In each of these cases, perhaps in descending order of probability, Cassaday might have "anticipate[d]" that the actions of police or of his family would eventually lead to the information being made available to authorities.[8]

When we move to attempting to assess the facts of this case under the relatively vague standard in *Cromer*, I come to a different conclusion than the majority. In particular, I would note that Cassaday penned *three* suicide notes, all directed in sealed envelopes to various persons to whom he wished to explain himself. As near as we can tell from the evidence, only one of those three notes in fact made it into the hands of the police or into court testimony. While I cannot glean definitively from the record, it certainly seems to be the case that the other two notes either were not voluntarily produced to the police; were not subpoenaed; or, in contradistinction to the notes to the

---

[8]The majority believes these hypotheticals are off the mark because "[a] person who writes a suicide note and then throws it into the trash, tears it up, or completely destroys it manifests actual intent *not* 'to bear testimony against the accused.'" Maj. Op. at 16 n.9 (quoting *Cromer*, 389 F.3d at 675). Thus, according to the majority, "[o]n those facts, we would not need to employ *Cromer*'s objective test." *Ibid.* This demonstrates the untenable nature of *Cromer*'s bipartite standard (to which I adverted in note 4, *supra*): on the majority's interpretation of the Confrontation Clause, a statement might have been made under circumstances in which a reasonable declarant *would* have expected the statement to be used prosecutorially, yet fail to qualify as testimonial because the declarant manifested *subjective intent* (however unreasonable) that it *not* be so used. What result if Cassaday, merely intending to set the record straight before his death, had hand-delivered to the Flint, Michigan chief of police a letter graphically implicating Miller in her husband's death, with a polite (and genuine) request that it not be used against her? What if Cassaday had delivered the same letter to the chief of police with no special requests, but mentioned to *his brother* (or some other third party) that he hoped the authorities would elect not to use it against Miller? In either situation, Cassaday would have "manifest[ed] actual intent *not* 'to bear testimony against [Miller].'" Would the majority therefore find these hypothetical letters non-testimonial, too? Or would the objective half of the *Cromer* standard now trump the subjective one – and, if so, why?

parents, did not contain incriminating information. In any event, those facts lead me to see each of the notes as having been driven entirely by personal considerations.

Cassaday obviously understood how to provide evidence to authorities, with a good chain of custody to enhance its usability as evidence. The material in the briefcase was clearly designed for the use of the police. There is no evidence of sealing or date-stamping of the briefcase that would have prevented him from placing the suicide note in the briefcase to ensure that it, too, would go to the authorities. Further, the one letter out of the three which is known to us – the letter to Cassaday's parents – speaks of his taking *completely independent* steps for the purposes of revenge and law enforcement ("I'm sending [the evidence of Miller's involvement] to the police. She will get what is coming."). It says nothing directing or anticipating that *the note itself* be given to the police, and the phrasing of the note suggests that Cassaday did not view it as part of the evidence against Miller. For all of these reasons, I would not hold under the first, subjective half of the *Cromer* standard that Cassaday "intended" to bear testimony through the note.

Nor would I hold that Cassaday's note meets the second, objective half of our *Cromer* standard. In particular, I note that the cases applying the *Cromer* standard cited by the majority seem to follow a more narrow interpretation of "anticipate." *See* Maj. Op. at 13 (citing *United States v. Mooneyham*, 473 F.3d 280, 286-87 (6th Cir. 2007); *United States v. Johnson*, 440 F.3d 832, 843 (6th Cir. 2006); *United States v. Barry-Scott*, 251 F. App'x 983, 989-90 (6th Cir. 2007)). Only in *Barry-Scott* (an unpublished case) was a statement found testimonial, and in that case, it was made directly to police. In the other two cases, statements were held *not* to be testimonial when made to private citizens, even though a reasonably prudent person should certainly "anticipate" that anyone he talks to about his unlawful activity is a potential witness against him.

**III. Harmless Error**

**A. Waiver**

The majority holds that the state waived its harmless-error argument by failing to raise the issue of harmless error as to the suicide note in its initial answer to Miller's habeas petition. I disagree that an invocation of waiver is appropriate here. The majority relies on *United States v. Johnson*, 467 F.3d 559 (6th Cir. 2006), in which we observed that mere "perfunctory discussion" of harmless error in a government *appellate brief* "waive[s] that argument on appeal," *id.* at 564. Here, by contrast, the state has thoroughly briefed the issue of harmless error before this court; accordingly, *Johnson* is not on point. In fact, the majority cites no case from the Supreme Court or from this circuit (and I can find none) holding that a harmless-error argument is forever waived if not raised in a habeas respondent's initial answer before the district court.

Two considerations specific to this case further counsel against a finding of waiver. First, as the majority concedes, the state *did* argue the harmless-error doctrine in its answer before the district court, albeit in the section of its memorandum discussing the IMs between Cassaday and Miller, rather than the section dealing with the suicide note. Thus, even if it were the case that the state is required to claim "harmless error" in its answer or forever waive it – a proposition not established by any case that binds us – it is another thing entirely to assert that a harmless-error argument may be waived *as to particular pieces of improperly admitted evidence* if it is not separately asserted in the respondent's answer *with respect to each exhibit*. I am aware of no authority from any jurisdiction suggesting as much. Nor would such a proposition make sense. The state's answer gave Miller fair notice that the harmless-error doctrine would be at issue in this proceeding. Moreover, that doctrine involves the consideration of the value of the complained-of evidence relative to the value of *all* evidence before the jury. *See Brecht v. Abrahamson*, 507 U.S. 619, 641 (1993). The state's assertion of harmless error with respect to the IMs therefore placed in issue the relative evidentiary value of the suicide note.

Secondly, in Miller's reply to the state's answer, she explicitly argued that the admission of the *suicide note* (not the IMs), if erroneous, "was not harmless error." Accordingly, it is difficult to claim that the state's answer did not, in fact, fairly apprise Miller and the court that the harmfulness of the suicide note's admission was at issue in the proceeding. Nor can it be argued that Miller was actually prejudiced by the state's purported failure to raise the issue of harmless error as to the suicide note, as she argued that issue in any event. Thus, I would find that the state's harmless error argument has not been waived.

Finally, even if the technical requirements for waiver are met, many of our sister circuits have concluded that courts have the discretion to conduct harmless-error review sua sponte, even when the government utterly fails to raise the issue at any point. *See, e.g.*, *Sanders v. Cotton*, 398 F.3d 572, 582 (7th Cir. 2005); *United States v. Adams*, 1 F.3d 1566, 1575-76 (11th Cir. 1993); *Lufkins v. Leapley*, 965 F.2d 1477, 1481 (8th Cir. 1992); *United States v. Langston*, 970 F.2d 692, 704 n.9 (10th Cir. 1992); *United States v. Rodriguez Cortes*, 949 F.2d 532, 542-43 (1st Cir. 1991); *United States v. Pryce*, 938 F.2d 1343, 1347-48 (D.C. Cir. 1991); *United States v. Giovanetti*, 928 F.2d 225, 227 (7th Cir. 1991); *cf. Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004) ("[T]his court may consider a newly-raised [procedural] default argument, if it so wishes.").

With no meaningful analysis, the majority elects not to exercise its discretion to overlook waiver; the sole reason which the majority gives for its choice is "the State's [ostensible] decision not to raise this argument to the district court despite having every reason to do so . . . ." Maj. Op. at 18. But this is nothing more than restating the majority's (questionable) finding that waiver occurred in the first place.

Our sister circuits have recognized that overturning a state-court judgment "may be an excessive sanction for the government's having failed to argue harmless error," *Giovanetti*, 928 F.2d at 227, and that several independent considerations should be analyzed to determine whether it is appropriate to overlook waiver of harmless-error review. Among these are "whether the harmlessness of the error or errors found is certain or debatable," *ibid.*, whether conducting harmless-error review would "waste[]

. . . judicial resources [by] requir[ing] the appellate bench to delve independently into a complex record without the aid of the government's brief and the defendant's responses to it," *Rodriguez Cortes*, 949 F.2d at 543, and whether "defense counsel's lack of opportunity to answer potential harmless error arguments may lead the court to miss an angle that would have shown the error to have been prejudicial," *Pryce*, 938 F.2d at 1347.

Here, because both parties have briefed the issue fully at the appellate level, overlooking waiver would not waste this court's judicial resources and would cause no prejudice to Miller. Further, as I discuss below, the harmlessness of any Confrontation Clause error is so obvious that insistence on strict observation of the waiver doctrine would merely "result in protracted, costly, and ultimately futile proceedings in the district court," thus not helping Miller "beyond such undeserved benefits as [s]he may derive from delay." *Giovanetti*, 928 F.2d at 226-27. I see no countervailing considerations in this case that weigh against exercising our prerogative to conduct harmless-error review notwithstanding any supposed waiver.

**B. Harmlessness**

Because the majority premises its holding that the writ must issue entirely on its finding that harmless-error review was waived, *see* Maj. Op. at 18, it does not reach the issue of harmlessness, other than to observe in a footnote that the prosecution mentioned the suicide note in its closing argument and that the state trial court chose to admit the note under Michigan's residual hearsay exception, which requires that court to determine that "the statement is more probative on the point for which it is offered than any other evidence" reasonably available. *See* Mich. R. Evid. 804(b)(7).[9]

I would find any Confrontation Clause error harmless because the admission of the suicide note did not "ha[ve] a substantial and injurious effect or influence in

---

[9]Even if we grant that the state trial judge was correct that the suicide note was "more probative" than any other single piece of evidence in this case, that does not imply that the remainder of the voluminous evidence against Miller would not have led any reasonable jury to convict, even if *no one piece* of it was as probative as the suicide note.

determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007). The most important factor in the harmlessness calculus is the (properly admitted) transcript of the IM conversation from the night before Bruce was killed, in which Cassaday and Miller discussed the impending murder in chilling detail. It is beyond debate that if the jury believed this IM transcript was authentic, the case would be open-and-shut, and the suicide note would have been entirely cumulative.[10]

And while Miller argues that the transcript could have been forged by Cassaday, I do not believe any reasonable jury could have concluded that the transcript was inauthentic. Among other facts corroborating the IM transcript are the following details:

• Records from America Online introduced at trial established that both Cassaday and Miller were online (and offline and online again, repeatedly) at precisely the time the IM transcript indicates that the exchange took place.

• The IM transcript shows Miller and Cassaday speaking of the necessity of removing Bruce's wallet, and indeed, his wallet was missing from his body and was never found.

• The IM transcript portrays Miller correctly describing to Cassaday the layout of Bruce's workplace (e.g., the location of a light switch, the direction in which the door opens), which Cassaday had no apparent reason to know independently.

• According to the IM transcript, Miller planned to call Bruce's workplace once around 5:00 p.m., then call him back and keep him on the phone to insure his solitary vulnerability to the impending murder. Miller would then call Cassaday and "[l]et it ring once" to signal that the coast was clear. Finally, she would call Bruce back and keep him on the phone "just until he says [Cassaday] pulled up" at the door. And indeed, telephone records established that Miller's land line placed a phone call to Bruce's office at 4:47 p.m. on the day of the murder; then another at 6:08; then a call at 6:16, which rang but was not answered, to *her own* cellular phone, presumably then in Cassaday's possession (and which was never used again thereafter); and then another call to Bruce's workplace at 6:20 – all at approximately the time when the murder undisputedly occurred.

_____

[10]This is so notwithstanding the vague and contradicted testimony that Bruce's co-worker, John Hutchinson, had threatened to "dispose of" him. *See* Maj. Op. at 4. For the jury to have found that Hutchinson had committed the murder independently and that Miller was blameless, it would have had to believe that Hutchinson, by the most galactically improbable string of coincidences, killed Bruce at the same time Cassaday was in Flint on the fateful mission about which he had spoken to his brother and Miller in advance, and in precisely the manner that Miller and Cassaday had discussed the night before. *See infra* at 34-36.

•     According to the IM transcript, during that conversation, Cassaday told Miller to "write . . . down" the name and telephone number of an individual (his lawyer, John O'Connor) to contact should anything go awry, and that very telephone number was later found on a pad in Miller's home, and in her handwriting. Further, according to the IM transcript, Cassaday misspelled O'Connor's name as "Occonnor" and provided incorrect office and home telephone numbers (the former with one incorrect digit, and the latter with two digits transposed). These very same errors were found on the handwritten note in Miller's home.

Thus, in order to believe that the IM transcript was inauthentic, the jury would have had to believe that Miller and Cassaday – by remarkable coincidence or by Cassaday's sinister design – were online simultaneously (perhaps chatting about the weather) at the exact same time Cassaday's damning IM printout suggests they were online plotting the murder; that Cassaday somehow independently knew that Bruce's wallet had been taken and independently knew the layout of Bruce's workplace; that Cassaday somehow had access to Miller's telephone records, or otherwise was able to guess exactly which phone calls Miller placed surrounding the time of the murder; and that Cassaday somehow contrived to communicate O'Connor's (misspelled) name and (incorrect) telephone numbers to Miller at some other point in time and contrived to have her retain them. No reasonable jury could entertain all of these beliefs.

Furthermore, the record is replete with other legitimately admitted circumstantial evidence of Miller and Cassaday's murderous conspiracy. First, Miller had very specifically indicated to Cassaday on prior occasions the possibility, desirability, and even necessity, of his killing Bruce. For instance, in the two weeks before the murder, Miller sent Cassaday a thinly disguised "story" she had written about a woman (whose biographical details matched her own) trapped in an abusive marriage, whose husband's "death . . . is [the] answer" to her problems; Miller advised Cassaday to "read[] between the lines" and asked him to "come up with a beautiful ending" to the story. She also sent Cassaday an e-mail in which she "wish[ed] that Bruce would not wake up from his nap . . . [and that] his heart would stop beating" and stated that "living [again] is what I will do when he dies." Shortly thereafter, and just before the murder, she wrote to Cassaday that she was "[t]rying to find something or someone to help me end this." There was also undisputed evidence that Cassaday had warned his brother before the murder that

he was going out of town on a mission from which he might not return, and it was undisputed that Cassaday had told Miller in an e-mail that he "[would] be coming back [to Michigan] for the last time" on precisely the date that the murder subsequently occurred.

In short, in the words of Charles Dodgson, for the presence of the suicide note to have made any appreciable difference in the jury's verdict, they would have already had to "believe[] . . . six impossible things before breakfast." I would therefore hold that any hypothetical Confrontation Clause error was harmless.