*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0088p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CHARLES DORCHY,

          *Petitioner-Appellee,*

    *v.*

KURT JONES, Warden,

          *Respondent-Appellant.*

No. 04-1797

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-74662—Arthur J. Tarnow, District Judge.

Argued: January 26, 2005

Decided and Filed: February 23, 2005

Before: MOORE and GILMAN, Circuit Judges; WEBER, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Janet A. Van Cleve, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Todd A. Shanker, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Laura Graves Moody, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Todd A. Shanker, Andrew N. Wise, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellee.

---

**OPINION**

---

    RONALD LEE GILMAN, Circuit Judge. Charles Dorchy was convicted in state court of murdering his drug supplier, Larry Adams, and was sentenced to life in prison without parole. During Dorchy's trial, the prior testimony of one unavailable witness and the recorded statement of another were submitted to the jury over Dorchy's objection. On appeal, the Michigan Court of Appeals decided that the prior testimony was properly admitted into evidence. It concluded that the recorded statement, on the other hand, was improperly admitted, but determined that the error was harmless. Dorchy subsequently filed a petition for a writ of habeas corpus in federal district court. The district court granted a conditional writ, finding that the Michigan Court of Appeals had

---

[*] The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

unreasonably applied existing Supreme Court precedent.   For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.      Factual background

The facts of the present case turn on the events of January 10, 1996, when Adams was shot and killed during a drug-related altercation.  Dorchy, who owed Adams $10,000 in drug money, claimed that he shot Adams in self-defense.  But Dorchy immediately fled to Florida, and was not located until two-and-a-half years after the killing.  Once apprehended, he was charged with first-degree murder, assault with the intent to murder, and being a felon in possession of a firearm.

Although all parties agree that Dorchy was directly involved in Adams's death, disagreement persists over the exact sequence of events.  A number of individuals who witnessed various parts of the altercation testified at Dorchy's trial.  Melody Hurst, Adams's cousin, related that she got into a van on January 10, 1996 with Dorchy, Ira Oldham, and Damien Martin.  (Martin was subsequently charged with and convicted of second-degree murder in connection with Adams's death.)  Melody testified that, during the van ride, Oldham was paged by Adams, prompting Dorchy to call Adams back on his cellular phone.  She stated that she overheard Dorchy say, "Nigger, I'll kill you," and "Nigger, I  ain't got nothing," in a belligerent way.  Melody then said that Dorchy asked Martin to hand him the "mag," and that in response Martin handed him a nine-millimeter semiautomatic gun.  She concluded by saying that the van parked about two or three minutes away from Adams's house, and that Dorchy and Martin exited.

Two other relatives of Adams also testified at Dorchy's trial.  One was Stephanie Hurst, who said that she walked by Dorchy, Adams, Martin, Ernest Knox, and Dion McCrary as they stood outside on the sidewalk when she went from her house to her brother-in-law's house on January 10, 1996.  She noted that the men were not arguing or fighting, but that Adams had a "serious" look on his face.  Stephanie walked away and entered her brother-in-law's house, but immediately went back outside when she heard gunshots.  She stated that she then saw Adams lying face down on the ground, his hands in his pockets.

The other relative was Robin Hurst, Stephanie's niece, who testified that she was inside Stephanie's house when she saw the same group of men standing outside.  According to Robin, no one seemed upset or angry.  When she heard gunshots, she looked outside to see Adams lying on the ground.

The jury also heard from Lieutenant James Thompson, the first officer on the scene.  He testified that, on the night in question, he had been dispatched to an apartment complex where shots were reportedly fired.  When he arrived, Lieutenant Thompson found Adams's body on the ground, his hands tucked into his coat pockets.  He noted that Adams had a nine-millimeter semiautomatic pistol in his right waistband, and that scattered around were several shell casings and one spent bullet.  Lieutenant Mike Thomas, the forensics expert who examined the bullets and casings found at the site, testified that three of the cartridge cases were from a nine-millimeter handgun.  Dr. Mark Fischione, the county medical examiner who performed an autopsy on Adams, opined that the first wound Adams suffered came from the "end of the muzzle [being] held up against the back region."

The primary controversy in this appeal surrounds the transcribed testimony of Ernest Knox, one of the five men who were standing outside when Adams was killed.  Because Knox could not be located at the time of Dorchy's trial, a court reporter instead read the transcribed testimony given by Knox in the earlier trial of Damien Martin.  Knox had stated in his prior testimony that he was with Adams and Dion McCrary when Dorchy and Martin arrived.  According to Knox, Dorchy and

Adams discussed a drug debt that Dorchy owed, following which the group of men moved outside. The transcript of the direct examination then reads as follows:

> Q.    Okay.  What did Mr. Dorchy do then?
> A.    Just kept talking.
> Q.    Did you see Mr. Dorchy pull a firearm out?  What did you observe Mr. Dorchy do then?
> A.    I observed him kill Mr. Adams.
> Q.    Okay.  How did he kill Mr. Adams?
> A.    Shot him in the back of the head.
> Q.    Okay.  Did he pull a gun out of his pocket?
> A.    Yeah.
> Q.    And . . . what did Mr. Adams do just prior to Mr. Dorchy shooting him?
> A.    He kind of like, it was turned head and he shot him in the back of the head.
> Q.    Okay.  Charles Dorchy shot Adams in the back of the head?
> A.    Yes.

The only other unindicted eyewitness, McCrary, had earlier testified outside of the jury's presence and had stated that, if called as a witness during Dorchy's trial, he would assert his Fifth Amendment right against self-incrimination.  In response, the prosecution moved to have a tape containing the statement that McCrary had made to the police immediately after the shooting admitted into evidence.  The state trial court agreed.  McCrary's statement to the police was then played to the jury.  On the tape, McCrary said: "I think [Adams] was talking to somebody and then Dorchy came right in and shot him about three times.  If I'm not mistaken he shot him three times in the head and I just seen [Adams] just fall straight and then [Dorchy] turned to me and shot at me."

The jury also heard from Dorchy himself, who admitted that he owed Adams $10,000 in drug money and was therefore avoiding him.  He further said that he had spoken to Adams earlier on his cellular phone, and that Adams had told him to "[b]ring my mother fuckin money."  According to Dorchy, his life was in danger and he felt scared and threatened.  He stated that, once the men were outside, they began conversing.  Dorchy testified that, after things got tense, "Knox pulled a gun. . . . I thought [he] was going to shoot me."  He then pulled his own gun out and immediately ducked and fired, thinking that Adams would also "turn around and shoot" since "he was going for something."  Throughout his testimony, Dorchy repeated that he feared for his life, and that both Knox and Adams were acting in a threatening fashion toward him.

## B.    Procedural background

Dorchy was found guilty by the jury on one count of first-degree murder and on one count of possession of a firearm during the commission of a felony.  Earlier, Dorchy had pled guilty to being a felon in possession of a firearm.  He was subsequently sentenced by the state court to life imprisonment without the possibility of parole on the murder charge, and to shorter terms of imprisonment on the firearm-possession charges.  The court also ordered Dorchy to pay $20,000 in restitution.

Dorchy subsequently appealed to the Michigan Court of Appeals, which affirmed his conviction and sentence.  *People v. Dorchy*, No. 217665, 2001 WL 1134733 (Mich. Ct. App. Sept. 18, 2001) (unpublished).  His delayed application for leave to appeal to the Michigan Supreme Court was denied.  *People v. Dorchy*, 643 N.W.2d 575 (Mich. 2002).  Dorchy then filed a petition for a writ of habeas corpus in federal district court, asserting that his Sixth Amendment rights were violated when the out-of-court testimony by Knox and the statement by McCrary were admitted into evidence.  The district court agreed, granting Dorchy a conditional writ on May 26, 2004.  *Dorchy v. Jones*, 320 F. Supp. 2d 564 (E.D. Mich. 2004).  This timely appeal by the state followed.

## II. ANALYSIS

### A.     Standard of review

The present case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA), which has increased the deference that federal courts must give to state-court decisions. *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998) ("[AEDPA] tells federal courts:  Hands off, unless the judgment in place is based on an error grave enough to be called 'unreasonable.'") (quoting *Lindh v. Murphy*, 96 F.3d 856, 870 (7th Cir. 1996)).

Legal determinations made by state courts are entitled to substantial deference under AEDPA.  Such questions are governed by § 2254(d), which provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Frazier v. Huffman*, 343 F.3d 780, 787 (6th Cir. 2003), *amended by* 348 F.3d 174 (6th Cir. 2003).

Similarly, under the "unreasonable application" clause, a federal court may grant habeas relief if the state identifies the correct governing principle but unreasonably applies that principle to the facts involved. *Williams*, 529 U.S. at 407-08.  The proper inquiry is whether the state-court decision was "objectively unreasonable," rather than simply incorrect. *Id.* at 409-11.  Dorchy must therefore demonstrate that the conclusions of the Michigan Court of Appeals that Knox's testimony was admissible and that the admission of McCrary's statement was harmless were "contrary to," or involved an "unreasonable application of," existing federal law.

### B.     The admission of Knox's testimony

Both the Michigan Court of Appeals and the district court analyzed the statements made by Knox under *Ohio v. Roberts*, 448 U.S. 56 (1980), the governing standard at the time of Dorchy's direct appeal.  The parties acknowledge that *Roberts*, which adopted the "indicia of reliability" approach toward an out-of-court statement, has since been overturned by *Crawford v. Washington*, 541 U.S. __ , 124 S.Ct. 1354, 1369 (2004) (rejecting *Roberts* and finding that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine").  Under most circumstances, however, newly promulgated rules of criminal procedure do not apply retroactively to cases on collateral review. *Teague v. Lane*, 489 U.S. 288, 305-11 (1989) (holding that a habeas petitioner could not benefit from a recent Supreme Court decision declaring racially-based preempetive challenges invalid, because that decision could not be applied retroactively to cases on collateral review); *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004) ("[R]eview is conducted in light of the law as it existed at the time of the final state court decision . . . .").  *Teague* thus prohibits

Dorchy from availing himself of the new rule articulated in *Crawford*. The question before us is therefore whether the analysis by the Michigan Court of Appeals was contrary to, or involved an unreasonable application of, *Roberts*.

In *Roberts*, the Supreme Court noted that

> when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

448 U.S. at 66. The Supreme Court has further declared that such particularized guarantees of trustworthiness must "be drawn from the totality of the circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Idaho v. Wright*, 497 U.S. 805, 820 (1990). To clarify the point, the Court held that "evidence corroborating the truth of a hearsay statement" is irrelevant to a finding of trustworthiness. *Id.* at 822. Here, the parties agree that Knox was unavailable at trial and that the evidence he provided was not submitted under a firmly rooted hearsay exception. The key question, therefore, is the reasonableness of the conclusion by the Michigan Court of Appeals that the testimony contained particularized guarantees of trustworthiness.

With little discussion, the Michigan Court of Appeals concluded that Knox's testimony had sufficient guarantees of trustworthiness on four grounds: (1) Knox was cross-examined by Martin's lawyers, "who had a similar interest in challenging the reliability and accuracy of Knox's account of the shooting," (2) his statements to the police and his trial testimony in Martin's proceedings were consistent with each other and with a statement given by a second witness, (3) he was an eyewitness to the shooting, and (4) his testimony was given under oath. *People v. Dorchy*, No. 217665, 2001 WL 1134733, at *2. These four factors, taken together, led the court to conclude that "the trial court did not abuse its discretion in determining that the former testimony had adequate indicia of reliability." *Id.*

The most important of the factors is that Knox testified in Martin's trial and was cross-examined by Martin's defense counsel. But statements made by coconspirators who have never been cross-examined at any time by the defendant's own counsel have uniformly been held by the Supreme Court to be insufficiently trustworthy for admission under the Confrontation Clause. *Crawford*, 124 S.Ct. at 1369 ("Our cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."). This was true even in *Roberts*, in which the statement in question was taken from the defendant's preliminary hearing.

As noted by the district court, however, a number of pre-*Crawford* circuit-court decisions, relying on the totality of the circumstances, found that testimony given at a codefendant's trial was sufficiently reliable to satisfy *Roberts* if the witness had been cross-examined by the codefendant's counsel. Typical of such cases is *United States v. Shaw*, 69 F.3d 1249 (4th Cir. 1995), where a drug dealer had been charged along with his codefendant on various counts of distributing heroin and cocaine. The court in that case allowed the testimony of two witnesses who had testified at the codefendant's trial because "[the two codefendants] were coconspirators charged with the same criminal conduct [and] Shaw's interest in undermining the deceased witnesses' testimony was effectively represented by [the codefendant's] counsel when he cross-examined [the two witnesses]." *Id.* at 1254.

Similarly, the defendant in *United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990), was charged, along with several codefendants, of racketeering and gambling violations. The government's primary witness died before the defendant could be brought to trial. At issue before the court was whether the witness's testimony from a previous trial could be used against the defendant. In allowing the testimony to be admitted, the court noted that the most important factor was that "though Zannino's counsel never had an opportunity to question [the witness], the declarant was vetted at the earlier trial by defense attorneys who shared appellant's interest in denigrating [the witness's] credibility." *Id.* at 12. *See also United States v. Deeb*, 13 F.3d 1532, 1540 (11th Cir. 1994) (admitting the transcribed testimony of a unavailable witness because "the objectives of at least one of the codefendants were sufficiently similar to [the defendant's] that his cross-examination could and did probe [the witness's] motive or inducement to lie."). The logic at work in these decisions has been the one enunciated by the Ninth Circuit when it commented that "whether such cross-examination provides a sufficient indication of reliability turns upon whether the interests of those who were represented during cross-examination were advanced in a manner that was consistent with the interest of the defendant who lacked such representation." *Barker v. Morris*, 761 F.2d 1396, 1402-03 (9th Cir. 1985).

Noting this factor's importance, the Michigan Court of Appeals concluded, albeit with little discussion, that Martin that "had a similar interest [to Dorchy] in challenging the reliability and accuracy of Knox's accounting of the shooting." *Dorchy*, 2001 WL 1134733 at *2. The problem with this logic, however, is that Martin, as Dorchy's codefendant, had every incentive to shift the blame for Adams's death from himself to Dorchy. Indeed, Dorchy's key defense to the first-degree murder charge was that he acted in self-defense. Martin's primary defense, on the other hand, was that Dorchy had planned and executed the killing, and that Martin himself played only a minimal part in the confrontation. Counsel for Martin thus had little incentive to question Knox's credibility because his testimony provided the evidence they needed to reduce their client's degree of guilt. Martin and Dorchy would therefore have had conflicting motivations in any questioning of Knox.

The transcript from Martin's trial demonstrates that his defense counsel in fact prodded Knox into making statements implicating Dorchy, and raised questions that Dorchy's own lawyers would never have asked. For example, Knox was asked in a leading fashion whether Adams had acted threateningly toward Dorchy:

> Q.    All right. Was there anything special about what Adams was doing. He had his hands in his pockets, he was like, he was sort of like shifting from one foot to the other. Was there anything special that attracted your attention or rang an alarm in your head?
> A.    No, not really.
> Q.    All right. And suddenly out of the clear blue Dorchy pulls his gun out of his pocket, puts it to Larry Adams [sic] head and starts firing?
> A.    Yes.
> Q.    And I'm not mischaracterizing what happened, that's exactly how it happened isn't it?
> A.    Yes.

The jury, during Dorchy's trial, was read several pages of similar dialogue, with Martin's defense lawyers strategically leading Knox into asserting that Dorchy singlehandedly, and without provocation, killed Adams.

Had Knox been questioned by Dorchy's lawyers, the line of questioning would clearly have been different. Dorchy's defense counsel would certainly have refrained from asking leading questions that invited answers inconsistent with Dorchy's theory of self-defense. Furthermore, they would have questioned the credibility of Knox's statements. Dorchy himself claimed that Knox was

the first in the group of men to pull out his gun. Assuming the truth of Dorchy's testimony, Knox would have had a motive to lie during Martin's trial. Dorchy's lawyers would also have been quicker to object to prosecutorial questioning regarding Dorchy's role in the offense. In sum, the cross-examination of Knox by Martin's lawyers appears to have been harmful rather than helpful to Dorchy's defense.

The Michigan Court of Appeals also relied on its findings that (1) Knox's statements to the police and his trial testimony in Martin's proceedings were consistent with each other and with a statement given by a second witness, (2) he was an eyewitness to the shooting, and (3) his testimony was given under oath. But evidence corroborating the truth of a hearsay statement is irrelevant to a finding of trustworthiness. *Idaho v. Wright*, 497 U.S. 805, 822 (1990); *see also United States v. Gomez-Lemos*, 939 F.2d 326, 332 (6th Cir. 1991) ("[T]he Court in *Wright* instructs us to focus only on the 'relevant circumstances' that 'surround the making of the [hearsay] statement and that render the declarant particularly worthy of belief.'") (quoting *Wright*, 497 U.S. at 819) (alteration in original). This factor thus provides no support for the state court's ruling.

With regard to the fact that Knox was an eyewitness, many courts, including this one, have indeed concluded such a factor supports a finding of trustworthiness. *See United States v. Barlow*, 693 F.2d. 954, 962 (6th Cir. 1982) (noting that one important factor was that "[t]his information . . . was within [the declarant's] personal knowledge"). No court, however, has concluded that this factor alone provides a sufficient guaranty of trustworthiness to satisfy the Confrontation Clause. Likewise, the fact that Knox was under oath, while considered by some courts as a factor supporting trustworthiness, is also insufficient by itself to satisfy the Confrontation Clause. *See Deeb*, 13 F.3d at 1538 ("[T]he mere fact that a statement is made under oath is not enough to guarantee its trustworthiness.").

In sum, we believe that the analysis by the Michigan Court of Appeals was an unreasonable interpretation of the *Roberts* standard because Knox's testimony contained no particularized guarantees of trustworthiness. The state court's primary rationale was that Knox was cross-examined by Martin's lawyers, who purportedly "had a similar interest in challenging the reliability and accuracy of Knox's account of the shooting." This assumption, however, is contradicted by the facts of the case, as well as by the transcript of Knox's cross-examination. The remaining factors, although appropriately considered as favoring trustworthiness, are insufficient by themselves to establish an "indicia of reliability."

## C.     Knox's testimony as allegedly harmless

Unless a constitutional error has a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)), it will be considered harmless. The state argues that, even if the Michigan Court of Appeals was unreasonable in applying the *Roberts* standard to the present case, the resulting constitutional error did not have a substantial and injurious effect on the jury's verdict and was therefore harmless.

We find this argument unpersuasive. Although other witnesses testified at Dorchy's trial regarding the events before and after Adams was shot, Knox's transcribed testimony was the only eyewitness account heard by the jury besides McCrary's, and the Michigan Court of Appeals ruled that McCrary's statement was improperly admitted. Knox's testimony was therefore essential to the prosecution's entire case. Moreover, as Dorchy points out, Knox's testimony was admitted under Michigan's residual hearsay exception found in Rule 804(b)(6) of the Michigan Rules of Evidence. Under this exception, the statement admitted must be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." The Michigan Court of Appeals, consistent with Rule 804(b)(6), noted that "Knox's testimony was more

probative of the circumstances surrounding the shooting than any other evidence that the prosecution could procure through reasonable efforts." *Dorchy*, 2001 WL 1134733 at *2. This makes the state's present argument that Knox's testimony was insubstantial both unpersuasive and inconsistent.

## D.      McCrary's statement

The Michigan Court of Appeals noted that the recorded statement made by McCrary to the police was inadmissible because it "did not bear a sufficient indicia of reliability or guarantee of trustworthiness." *Id.* at *3. Nonetheless, the court concluded that "[n]otwithstanding the erroneous admission of McCrary's statement, reversal is not required because the error was harmless." *Id.* The district court concluded that the state court's decision was unreasonable in light of the district court's "determination that the admission of Knox's testimony from Martin's trial violated the Confrontation Clause and was not harmless." *Dorchy*, 320 F. Supp. 2d at 577. With little discussion, the state now argues that "the district court was wrong when it granted habeas relief on the claim involving the admission of McCrary's testimony solely in conjunction with its determination that the admission of Knox's testimony was erroneous."

The state's argument, however, is not supported by any authority. Because the Michigan Court of Appeals concluded that Knox's transcribed testimony was properly admitted into evidence, it did not consider the prejudicial effect that McCrary's statement, when taken alone, would have had on the jury. After excluding Knox's testimony, the recorded statement made by McCrary was the only eyewitness account of the shooting heard by the jury. We therefore conclude that the admittedly improper admission of McCrary's statement had a substantial and injurious impact on the jury's verdict.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.