MOORE, J., delivered the opinion of the court, in which GIBSON, J., joined. BOGGS, J. (pp. 928-39), delivered a separate dissenting opinion.
OPINION
KAREN NELSON MOORE, Circuit Judge.
The State of Michigan (“State”) appeals the district court’s conditional grant of a writ of habeas corpus to prisoner Sharee Miller (“Miller”), who is currently serving a life sentence for second-degree murder and conspiracy to commit first-degree murder. A jury found Miller responsible for the death of her husband after her lover, who allegedly pulled the trigger, committed suicide and left evidence implicating her in the crime. The district court held that Miller’s Sixth Amendment Confrontation Clause rights were violated by the admission at trial of the lover’s suicide note, which stated that Miller “was involved and helped set it up.” On review, we conclude that the suicide note was testimonial, that its admission violated the Confrontation Clause, and that the State waived harmless-error review. Accordingly, we AFFIRM the district court’s judgment and REMAND to the district court for further proceedings consistent with this opinion.
I. BACKGROUND
Miller married Bruce Miller (“Bruce”) in April 1999. Three months later, she met Jerry Cassaday, an ex-police officer, on a trip to Reno and began having an affair with him. From June to November of that year, Miller (in Flint, Michigan) and Cassaday (first in Nevada, then in Missouri) communicated extensively over email and through instant messages (“IMs”) and at times met in person. Miller sent Cassaday a number of pornographic photos and an X-rated video of herself. She told him tall tales, stating that her husband abused her and that his mob connections made it impossible for her to get help. Twice, she said, she had become pregnant by Cassaday, once with twins. (In fact, Miller had a tubal ligation in 1995.) She claimed that Bruce forced miscarriages both times, first by beating her and then by raping her and hiring someone else to rape her.
On November 7, 1999, Cassaday told his brother Mike that he was leaving town and that if he did not return in a couple of days, Mike should look for a briefcase under Cassaday’s bed. On November 8, 1999, Bruce was found dead in his office in Flint, Michigan at 9:00 p.m., having been shot at close range with a shotgun between 6:20 p.m. and 7:13 p.m. By December 1999, Miller had stopped seeing Cassaday, rebuffed his proposals of marriage, and started dating someone else. Cassaday grew more and more depressed, although the reasons appear mixed: he had long struggled with alcohol and drugs, he had recently been arrested twice and lost custody of his son, and his family feared he *917 was suicidal. On February 11, 2000, Cassaday shot and killed himself in his bedroom.
While cleaning up a few days later, Mike found a briefcase with four sealed envelopes placed on top of it under Cassaday’s bed. Joint Appendix (“J.A.”) at 415. The first envelope, taped to the briefcase, was addressed to an attorney and bore in Cassaday’s handwriting the instruction, “Mike, do not open alone.” Id. The briefcase turned out to contain a nine-page printout, marked by hand with the date of the night before the murder, of an IM conversation between Cassaday and Miller. The printout purportedly revealed that the two had planned Bruce’s murder. Investigators found that several details from the IMs matched the events surrounding the killing, though Miller claims these were all publicly reported. The briefcase also contained computer disks with the images Miller had sent to Cassaday. The other three envelopes found on top of the briefcase were addressed to Cassaday’s son, ex-wife, and parents. The letter to his parents (the “suicide note”) explained his relationship with Miller, the duo’s plot to kill Bruce, and Cassaday’s decision to commit suicide rather than go to prison. It stated, “I drove there and killed him. Sharee was involved and helped set it up. I have all the proof and I’m sending it to the police. She will get what is coming.” Id. at 420. Cassaday wrote that Miller had manipulated him and that “she is soon to learn that she can’t do that to people.” Id. Police also recovered emails from Cassaday’s computer documenting the stories Miller had told him. They did not find an electronic copy of the IM conversation, which could have been saved to the computer’s hard drive.
Prosecutors charged Miller with Bruce’s murder. The trial court admitted the photographs, emails, IMs, and suicide note into evidence. Miller testified that she did not believe Cassaday murdered Bruce and pointed to an alternative suspect. She produced evidence that one of Bruce’s business partners, John Hutchinson, had threatened to “dispose of’ Bruce because of a criminal investigation involving both of them and a dispute over a loan, id. at 1260; that Hutchinson told his brother at 7:00 p.m. the night of the murder that he had “disposed of Bruce,” id. at 1255; that Hutchinson was not home between some time after 5:00 p.m. and 7:30 p.m. that night; and that Hutchinson’s step-son told police that Hutchinson acted “strange” upon returning that night, id. at 1214-15. On December 22, 2000, the jury convicted Miller of second-degree murder and conspiracy to commit first-degree murder. She received a life sentence.
The Michigan Court of Appeals affirmed the conviction, rejecting Miller’s claims that the admission of various hearsay testimony violated the Confrontation Clause. People v. Miller, No. 233018, 2003 WL 21465338 (Mich.Ct.App. June 24, 2003). The Michigan Supreme Court denied leave to appeal on April 1, 2004, and denied a motion to reconsider on June 30, 2004.
Miller filed a federal habeas petition on September 7, 2005. A magistrate judge recommended that the district court rule that the suicide note’s admission violated the Confrontation Clause but that it was harmless error; that the IMs were not testimonial and did not implicate the Constitution; that Cassaday’s instructions to Mike were not statements under hearsay doctrine; and that the emails, video, and photos were not so prejudicial as to have violated Miller’s right to a fair trial. The district court adopted the recommendations, except as to the harmlessness of admitting the suicide note. Finding that the State had waived the argument and that the error was not harmless, the district judge conditionally granted the writ. *918 Miller v. Stovall, 573 F.Supp.2d 964, 983 (E.D.Mich.2008). The State timely appealed.
II. ANALYSIS
The State makes three arguments against habeas relief: (1) the suicide note was not “testimonial,” meaning that it did not implicate the Confrontation Clause; (2) the district court erred in finding that the State had waived any harmless-error argument; and (3) any constitutional violation was harmless error.
A. Confrontation Clause
1. Standard of Review
The Confrontation Clause of the Sixth Amendment provides that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” U.S. Const, amend VI. This right is incorporated against the states through the Due Process Clause of the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). For over twenty years, courts analyzed confrontation challenges using Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), under which hearsay statements were admissible so long as they bore sufficient “indicia of reliability,” that is, if they fell into a “firmly rooted hearsay exception” or bore “particularized guarantees of trustworthiness.” Id. at 66, 100 S.Ct. 2531. In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court revised its understanding of the confrontation right.[1] The Court held that if a hearsay statement is testimonial, it can be admitted against a criminal defendant only if the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine the declarant. Id. at 59, 124 S.Ct. 1354. Although the Court left unanswered whether Roberts still governed nontestimonial hearsay, id. at 68, 100 S.Ct. 2531, it later held that the Confrontation Clause did not apply at all to such statements, abrogating Roberts in full, see Davis v. Washington, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
We review a district court’s habeas ruling de novo. Souter v. Jones, 395 F.3d 577, 584 (6th Cir.2005). On collateral review, the amount of deference paid to a state court varies based on the nature of that court’s ruling. Under the Antiterrorism and Effective Death Penalty Act (“AEDPA”), when a state court adjudicates a claim on the merits, a federal court can grant the writ only if the state court’s adjudication “(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). A state-court decision is contrary to clearly established federal law “if the state court arrives at a conclusion opposite to that *919 reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.” Terry Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A decision is an unreasonable application of clearly established federal law “if the state court identifies the correct governing legal principle from [the Supreme] Court’s decisions but unreasonably applies that principle to the facts of the prisoner’s case.” Id. When the state court does not address the merits of a claim, AEDPA deference does not apply and a federal court reviews the petitioner’s legal claim de novo. Maples v. Stegall, 340 F.3d 433, 436-37 (6th Cir.2003) (citing Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)).
In the instant case, the Michigan Court of Appeals resolved Miller’s Confrontation Clause claim on the merits, but it did so under Roberts, then good law, rather than Crawford, which replaced Roberts as the governing standard while Miller’s direct appeal was still pending before the Michigan Supreme Court. We must determine, then, whether to review Miller’s claim under the law prevailing at the time of the state appellate decision or the law prevailing at the time Miller’s conviction became final. The Second Circuit has discussed the Supreme Court’s conflicting guidance on this question:
In [Terry ] Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), Justice Stevens, writing for a majority of the court, stated: “The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final.” Id. at 390, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (Stevens, J., for the court) (emphasis added). In a separate opinion, Justice O’Connor, also writing for a majority of the court, stated that the phrase “clearly established Federal law, as determined by the Supreme Court” refers “to the holdings, as opposed to the dicta, of this Court’s decisions as of the time of the relevant state-court decision.” Id. at 412, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (O’Connor, J., for the court) (emphasis added).
Brown v. Greiner, 409 F.3d 523, 533 n. 3 (2d Cir.2005). Typically, this distinction in language will be immaterial. Where, as here, the law changes after a state court rules on a petitioner’s claim but before her conviction becomes final, it may be critical. The Supreme Court has never confronted this issue. It has cited Justice O’Connor’s language in cases since Terry Williams, see, e.g., Yarborough v. Alvarado, 541 U.S. 652, 660-61, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), but those cases did not involve changes in the governing law between the issuance of the state-court merits decision and the conviction becoming final.
We conclude that when the governing law changes between a state court’s ruling and the date on which a petitioner’s conviction became final, a federal habeas court reviewing the state-court judgment must apply the law that controlled “at the time his state-court conviction became final.” Terry Williams, 529 U.S. at 390, 120 S.Ct. 1495. At least four reasons support our conclusion. First, Justice O’Con-nor joined the part of Justice Stevens’s opinion in which he stated that a rule applies on habeas review if it was “clearly established at the time his state-court conviction became final,” Terry Williams, 529 U.S. at 367, 390, 120 S.Ct. 1495. Second, as the magistrate judge in this case noted, immediately after articulating the standard in her opinion, Justice O’Connor remarked that “whatever would qualify as an old rule under our Teague jurispru *920 dence will constitute ‘clearly established Federal law, as determined by the Supreme Court of the United States’ under § 2254(d)(1).”[2] Id. at 412, 120 S.Ct. 1495. Under Teague v. Lane, a rule is “old” and applies on collateral review if it was in place by the time a petitioner’s conviction became final. Teague, 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (O’Connor, J.) (“[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant’s conviction became final.”); Beard v. Banks, 542 U.S. 406, 411, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004); Wright v. West, 505 U.S. 277, 304, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (O’Connor, J., concurring in the judgment). Taken together, these two observations suggest that by “relevant state-court decision,” Justice O’Connor may have meant a state-court decision rendered at a time at which the law required what it required when the conviction became final. In that case, the “relevant state-court decision” here would be the Michigan Supreme Court’s denial of leave to appeal or its denial of Miller’s motion for reconsideration; neither provided an adjudication of Miller’s Crawford claim on the merits, so we would review the claim de novo. At the very least, these observations suggest that Justice O’Connor did not anticipate that the law applied by an intermediate court resolving the claim might differ from the law governing when the defendant’s conviction becomes final.
Third, reading Justice O’Connor’s opinion in Terry Williams as limiting federal habeas courts to the law applicable at the time of the intermediate state court’s decision puts AEDPA and Teague in unintended conflict. “[T]he AEDPA and Teague inquiries are distinct.” Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002). Teague bears on the law that applies on habeas review; as Justice O’Connor points out in Terry Williams, AEDPA imposes a more deferential standard of review in some circumstances, but the statute does not alter the applicable law except insofar as it “restricts the source of clearly established law to [the Supreme] Court’s jurisprudence.” Terry Williams, 529 U.S. at 407-09, 412, 120 S.Ct. 1495; see also id. at 379, 120 S.Ct. 1495 (Stevens, J.) (“The antiretroactivity rule recognized in Teague, which prohibits reliance on ‘new rules,’ is the functional equivalent of a statutory provision commanding exclusive reliance on ‘clearly established law.’ ”); Danforth v. Minnesota, 552 U.S. 264, 128 S.Ct. 1029, 1058, 169 L.Ed.2d 859 (2008) (Roberts, C.J., dissenting) (explaining that AEDPA “has no bearing on our decisions about whether new or old law should apply in a particular case”); Allen v. Omoski, 435 F.3d 946, 955 (9th Cir.2006) (“The Supreme Court has adopted the definition of new law fashioned in Teague ... to determine what qualifies as clearly established law under AEDPA.”). That is, it would seem to contravene both Justice O’Con-nor’s and Justice Stevens’s opinions in Terry Williams to hold that AEDPA departs from Teague’s emphasis on the point at which a petitioner’s conviction becomes final. One judge in this circuit has already counseled against such an approach. See Fulcher v. Motley, 444 F.3d 791, 821-22 (6th Cir.2006) (Clay, J., concurring) (reasoning that AEDPA does not independently preclude application of a Supreme Court *921 case that would be retroactive under Teague ).[3]
Fourth, the principles of comity, finality, and federalism do not require us to conclude otherwise, especially when, as in this case, the petitioner provided the state courts an opportunity to decide the constitutional claim in light of the change in the governing law.[4] Indeed, a contrary approach would allow a state supreme court — by denying review on a basis other than the merits despite being notified of the change in law — to insulate lower state-court judgments from meaningful review and deny defendants the benefit of doctrinal changes to which they are generally entitled on direct review. See Griffith v. Kentucky, 479 U.S. 314, 321-22, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); Bell v. Maryland, 378 U.S. 226, 232, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964).
We therefore hold that Miller’s claim is governed by Crawford, not Roberts. This approach is consistent with our description of the habeas inquiry as “limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner’s] conviction became final.” Onifer v. Tyszkiewicz, 255 F.3d 313, 317-18 (6th Cir.2001).
We turn next to whether we ought to defer to the state court’s judgment under AEDPA. Notwithstanding the district court’s statement to the contrary,[5] no state court ever decided the key issue upon which this case turns: whether the suicide note is testimonial. Given this procedural *922 posture, AEDPA deference to the state courts is inappropriate because there is simply no analysis or conclusion on the central legal question to which to defer. See Wiggins, 539 U.S. at 534, 123 S.Ct. 2527 (holding that the Court’s review of a claim of ineffective assistance of counsel “is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the Strickland analysis”).
At oral argument, it was suggested that the instant case is distinguishable from Wiggins because there the state courts failed to reach a particular issue (whether an attorney’s deficient performance prejudiced a defendant) whereas here the state court did decide the legal issue (whether the Confrontation Clause was violated). The proposal is that we defer to the state court’s ultimate conclusion on the Confrontation Clause claim. We submit that the instant case is in fact similar to Wiggins in that in both cases a state court ruled on the merits of a claim without resolving the pivotal legal issue on which that claim ultimately turned. More importantly, it is not coherent to defer to a state-court conclusion when the state court applied an analytical framework that has been explicitly overruled and that does not apply to this case. Congress enacted AEDPA deference “to further the principles of comity, finality, and federalism.” Michael Williams v. Taylor, 529 U.S. 420, 436, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). While echoing the denial of relief would close the case, it serves neither comity nor federalism to defer to a conclusion made on an inapposite legal question.[6] Moreover, it would disserve comity should we be required to label the state court’s decision an unreasonable application of law it never had occasion to apply. Finally, de novo consideration seems particularly appropriate given that the Michigan Supreme Court denied leave to appeal and reconsideration despite Miller’s alerting it to the Crawford decision while her direct appeal was pending.[7]
*923 2. Under Crawford, the Suicide Note Was Testimonial
There is no dispute that Cassaday was unavailable at trial or that Miller never had the opportunity to cross-examine him. The only issue is whether the suicide note was testimonial.
In Crawford, the Supreme Court declined to “spell out a comprehensive definition of ‘testimonial.’ ” 541 U.S. at 68, 124 S.Ct. 1354. It began at the extremes, noting that “[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.” Id. at 51, 124 S.Ct. 1354. It then listed three “formulations of th[e] core class of testimonial statements,” drawn from court filings and a previous case:
[(1)] “ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used proseeutorially,” Brief for Petitioner 23; [(2)] “extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,” White v. Illinois, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); [(3)] “statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,” Brief for National Association of Criminal Defense Lawyers et al. as Amici Curiae 3.
Id. at 51-52, 124 S.Ct. 1354. The Court noted that “all share a common nucleus.” Id. at 52, 124 S.Ct. 1354. It also declared that testimony at a preliminary hearing, grand jury proceeding, or former trial and statements in police interrogations are testimonial under any definition, id. at 52, 68, 124 S.Ct. 1354, and that business records and statements in furtherance of a conspiracy are nontestimonial “by their nature,” id. at 56,124 S.Ct. 1354.
In Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Court delivered a refined definition of “testimonial,” but only for a subset of cases involving police interrogation.[8] The Court explicitly cautioned that it did not mean “to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial,” because the Framers did not intend “to exempt from cross-examination volunteered testimony or answers to open-ended questions.” Id. at 822 n. 1, 126 S.Ct. 2266. In its most recent case on the Confrontation Clause, the Court appeared to discuss the three formulations as more than merely possible definitions. See Melendez-Diaz v. Massachusetts, — U.S. -, 129 S.Ct. 2527, 2531, 174 L.Ed.2d 314 (2009) (stating that in listing the three formulations, Crawford “described the class of testimonial statements covered by the Confrontation Clause”); id. at 2532 (in holding that drug-analysis certificates are testimonial, noting that “[o]ur description of [the core class of testimonial statements] mentions affidavits twice”).
*924 The Sixth Circuit has adopted a standard for applying the Supreme Court’s ruling in Crawford. In United States v. Cromer, 389 F.3d 662 (6th Cir.2004), this court offered the following guidance for determining whether a statement is testimonial:
The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant’s position would anticipate his statement being used against the accused in investigating and prosecuting the crime.
Id. at 675; see also United States v. Hinton, 423 F.3d 355, 359-60 (3d Cir.2005) (adopting the Cromer standard). Applying this standard, we held that a confidential informant’s statements to a police officer, relating the name identification and physical description of the defendant, were testimonial. Id. at 677-79. This court has consistently applied the Cromer standard. See, e.g., United States v. Mooneyham, 473 F.3d 280, 286-87 (6th Cir.2007) (co-conspirator’s statements to undercover police officer were not testimonial because he would not have believed they would be used at trial); United States v. Johnson, 440 F.3d 832, 843 (6th Cir.2006) (statement to twenty-five-year acquaintance was not testimonial when declarant had no reason to suspect acquaintance’s cooperation with law enforcement); United States v. Barry-Scott, 251 Fed.Appx. 983, 989-90 (6th Cir.2007) (unpublished opinion) (confidential informant’s statements to police officer were testimonial).
In the proceedings below, neither the magistrate judge nor the district judge relied on Cromer. Instead, the magistrate judge, whose reasoning the district judge apparently adopted, concluded that the suicide note was testimonial based on the second and third formulations suggested in Crawford: it was a confession, and it was made in circumstances in which an “objective witness” would expect it to be used at trial. Miller, 573 F.Supp.2d at 977, 983, 993-94. As to the former ground, the State argues that Crawford requires confessions to be “formalized,” that is, made to the police or some other state official, to be testimonial. Miller responds that the fact that the note was written by a former police officer, typed, signed, and placed in a sealed envelope made it formalized enough. The parties’ debate demonstrates why the Cromer standard is more useful than a bright-line rule about confessions: the question of how formal a confession must be to be testimonial turns on what level of formality would lead a reasonable person to expect the confession to be used in investigation or prosecution. Thus, we decline to decide the confession issue and move directly to the district court’s reliance on the third Crawford formulation, which is roughly the same as the Cromer standard.
In analyzing whether a reasonable person would expect the suicide note to be used at trial, the magistrate judge appears to have misstated the operative facts. The magistrate judge wrote, Cassaday “clearly intended for his letter to be found, a chain of evidence preserved (that is, through his instructions to his brother) and for the letter to be used as evidence against petitioner. He states his intention in the note itself, and planned in advance for his brother to find the letter and deliver it to authorities.” Id. at 994. These statements confuse the suicide note with the other materials that Cassaday left for his brother. The suicide note was addressed to Cassaday’s parents, was found on top of the briefcase, and contained no explicit instructions to preserve its authenticity or facilitate its delivery to law enforcement. It stated, “I have all the proof and I’m *925 sending it to the police,” J.A. at 420, but this statement appears to refer to the IM transcript and computer disks in the briefcase, not to the note itself.
Nonetheless, the magistrate judge, and the district judge in adopting the magistrate judge’s recommendation, correctly concluded that the note was testimonial. Under Cromer, in light of everything else that Cassaday, a former police officer, did to prepare the case against Miller, “a reasonable person in the declarant’s position would anticipate his statement being used against the accused in investigating and prosecuting the crime.” Cromer, 389 F.3d at 675. Because Cassaday took care to assemble, preserve, and arrange delivery to the police of the IM printout and disk images, and because the suicide note was placed atop the briefcase and contained a direct accusation of Miller, J.A. at 415, 420, it was foreseeable that the authorities would use the note against her. On this basis, the suicide note was testimonial, and its use violated Miller’s Sixth Amendment rights.
The State provides three reasons that we should decide differently. First, the State argues that the suicide note was found outside rather than inside the briefcase, indicating that Cassaday did not intend it to be part of the materials that would be opened by his lawyer and turned over to the police. Second, the State contends that Cassaday’s statement that he was sending “all the proof’ to the police most likely refers to the materials in the briefcase and indicates that he did not also intend the police to obtain the suicide note. And third, the State asserts that the note is merely a son’s explanation to his parents of why he took his own life, not a set of statements that Cassaday may have anticipated would be used at trial.
All three arguments deflect the Cromer reasonable-expectation test and depend on inferences about Cassaday’s actual intent based on the physical evidence. It is possible that, by leaving the suicide note outside the briefcase, Cassaday did not intend that the note reach the authorities. But Cassaday placed the suicide note directly on top of the briefcase, and it is equally possible that he saw the materials collectively as a parcel that could be used against Miller. Cassaday also had an interest in preserving the impression, accurate or not, that he had assembled the materials in the briefcase in November, just before the murder; he may have felt that adding the suicide note to the briefcase three months later could call into question the integrity of its other contents. Furthermore, the fact that Cassaday indicated that he was sending other materials to the police does not rule out that he hoped that the note would reach them as well. Nor does the fact that the note’s contents are directed to his mother and father contradict an intent that the police ultimately obtain access to the note. Human beings often act with multiple motives. Cassaday may have intended the letter both as an apology to his parents and as an indictment from the grave of his alleged co-conspirator. In that case, it would be reasonable to leave the letter outside the briefcase so that his parents would receive it, and receive it from him, rather than from investigators only after it had been logged into evidence.
The possibilities are several. The point is not that these scenarios are more likely than that envisioned by the State, but rather that it is difficult to divine actual intent in this case. Under these circumstances, we are on more stable ground applying Cromer’s reasonable-expectation test.[9] The suicide note includes incrimina *926 ting information that no other evidence provides: whereas the IMs merely attest to the planning, the note confesses that Cassaday, not a third party, actually completed the murder. Any reasonable person, particularly one with Cassaday’s training, who prepared the briefcase would anticipate the prosecutorial importance of a letter declaring “I drove there and killed him” and “Sharee was involved and helped set it up.” J.A. at 420. Clearly, the suicide note would be passed on to law enforcement.
For these reasons, we conclude on de novo review that the suicide note is testimonial and its admission at trial constituted constitutional error.
B. The State Waived Its Harmless-Error Argument
Confrontation Clause violations are subject to harmless-error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 682, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Here, the district court held that the State waived any harmless error argument by failing to make the argument in its briefing as to the suicide note, even while raising the issue as to the IMs. A different panel of this court has previously raised but declined to resolve the issue of whether this type of omission constitutes waiver. See Calvert v. Wilson, 288 F.3d 823, 832 n. 1 (6th Cir.2002) (declining to rule on petitioner’s argument that the State “waived the harmless error issue by raising it in a footnote [in the Return of Writ] without discussion or citation to authority” because petitioner was “entitled to relief whether [the State] waived the harmless error issue or not”); id. at 835-36 (Cole, J., concurring) (contending that the State’s harmless-error argument, which was not raised at the district court, should not be reviewed because “the warden bear[s] the responsibility of ensuring all defenses, including harmless error, are timely raised”).
Joining other courts that have considered the question, we now hold that a State waives harmless error when it fails to raise the issue in its response to the habeas petition in federal district court. Sanders v. Cotton, 398 F.3d 572, 582 (7th Cir.2005) (holding that by not making it in the district court, the State waived its argument on appeal that any jury-instruction error was harmless); Lam v. Kelchner, 304 F.3d 256, 269-70 (3d Cir.2002) (holding that the Commonwealth’s harmless-error argument in a habeas case “was never raised before the District Court and was therefore waived,” and noting that “the Commonwealth admits waiver”); Gabow v. Deuth, 302 F.Supp.2d 687, 706-07 (W.D.Ky.2004) (finding harmless error waived when neither the State’s answer nor its memorandum asserted the defense); Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 31.2a (5th ed. 2005) (“Like other defenses to habeas corpus relief, the ‘harmless error’ obstacle does not arise unless the state asserts it; the state’s fail *927 ure to do so in a timely and unequivocal fashion waives the defense.”). We therefore hold that the district court correctly concluded that the State waived any harmless-error argument.
Somewhat half-heartedly, the State challenges this finding, noting that the cases relied on by the district court involve express waiver. E.g., Hargrave v. McKee, 248 Fed.Appx. 718, 728 (6th Cir.2007) (unpublished opinion) (state checked box indicating no harmless-error argument). The State cites no cases, however, for the proposition that waiver of harmless error must be express, and this circuit’s case law indicates that harmless error can be waived even by “relying on ... a perfunctory discussion.” United States v. Johnson, 467 F.3d 559, 564 (6th Cir.2006).[10]
Finally, the State urges us to conduct harmless-error review sua sponte. We have no obligation in this regard but may do so in our discretion. Sowell v. Bradshaw, 372 F.3d 821, 830 (6th Cir.2004). In light of the State’s decision not to raise this argument to the district court despite having every reason to do so, we decline to reach the issue. See id. Because we hold that the State waived harmless-error review, the writ must issue.[11]
*928 III. CONCLUSION
Cassaday’s suicide note, confessing to Miller’s husband’s murder and accusing Miller of conspiring in the crime, was testimonial under Crawford because a reasonable person in Cassaday’s position would have anticipated its use by authorities in investigating and prosecuting Miller. Its introduction at trial violated Miller’s confrontation rights under the Sixth Amendment. Because the State waived the harmless-error argument, we AFFIRM the district court’s judgment conditionally granting the writ of habeas corpus and REMAND to the district court for further proceedings consistent with this opinion.

. The Supreme Court decided Crawford on March 8, 2004, while Miller’s application for leave to appeal was pending before the Michigan Supreme Court. The Michigan Supreme Court denied leave on April 1, 2004. Miller then moved for reconsideration, bringing the Crawford decision to the court’s attention. The Michigan Supreme Court denied the motion for reconsideration on June 30, 2004, and Miller’s conviction became final ninety days later on September 28, 2004. In Whorton v. Bockting, 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007), the Supreme Court held that Crawford was not retroactive on collateral review; however, Crawford governs here because a new rule applies to cases that are still on direct review when it is announced. Bockting, 549 U.S. at 416-17, 127 S.Ct. 1173.

. Contrary to the dissent's representation, Judge Merritt did not observe in Davis v. Straub, 430 F.3d 281 (6th Cir.2005), that "Justice O'Connor was not discussing Teague's temporal aspect in this passage.” Dissent at 931. Judge Merritt did not discuss the timing issue at all, and his belief that "clearly established” law under AEDPA tracked "old rules” under Teague in terms of the generality of the rule did not prevent him from believing that AEDPA tracked Teague with regard to timing, as well.

. The dissent states that the Eleventh Circuit has decided this issue differently. In Newland v. Hall, 527 F.3d 1162, 1198-1201 & nn. 62-64 (11th Cir.2008), Judge Tjoflat defined "the relevant state court decision as the decision on the merits of the claim” and noted the consequence "that AEDPA may in some cases restrict the scope of our review even further than Teague.” Id. at 1200 n. 64. That part of the opinion, however, was not joined by the other two panel members and thus is not the law of the circuit; Judge Tjoflat spoke only for himself.
Interestingly, Judge Tjoflat read AEDPA as requiring habeas courts to apply the law as of the time of the state-court merits decision, not as of the time the conviction became final, but nonetheless ruled out any benefit this might confer on defendants whose final state-court adjudications occur on postconviction review after a new rule is announced. See id. at 1199 n. 63 (assuaging the Fifth Circuit's concern in Williams v. Cain, 229 F.3d 468, 475 n. 6 (5th Cir.2000), that this interpretation would expand defendants’ rights by clarifying that "[t]he independent application of the Teague analysis will still prevent the application of any new rule established after a petitioner’s conviction becomes final on direct appeal, regardless of our definition of the relevant state court proceedings”). Judge Tjoflat treated AEDPA, insofar as it modifies Teague, as a one-way ratchet. On this view, AEDPA trumps Teague when the state-court merits decision and the change in the law both occur before the conviction becomes final but the merits decision comes first, but Teague trumps AEDPA when the merits decision occurs on postconviction review, even if the state court applies the new rule. Such an interpretation depends on the selective invocation of the principles of comity and federalism and a failure to follow them to their logical end.

. The dissent faults Miller for failing to seek certiorari because a petition to the Supreme Court “could well have resolved the matter by requiring the state court to confront the new law directly.” Dissent at 930 n. 2. That is a peculiar reproach. Had Miller sought certiorari, the Court would have remanded her case for reconsideration in light of Crawford, giving the state court precisely the same opportunity Miller herself created by filing for reconsideration in light of Crawford. Her decision to seek reconsideration by the Michigan Supreme Court rather than file a petition for a writ of certiorari in the U.S. Supreme Court therefore is not a reason to review the Confrontation Clause claim under Roberts.

. See Miller, 573 F.Supp.2d at 977 (stating that the state court "unreasonably found that the suicide note was not testimonial”).

. In a separate line of cases, we have applied “modified AEDPA deference” when the state court adjudicates a claim without articulating its reasoning or with little analysis. This standard requires a federal court “to conduct a careful review of the record and applicable law, but nonetheless bars the court from reversing unless the state court's decision is contrary to or an unreasonable application of federal law.” Maldonado v. Wilson, 416 F.3d 470, 476 (6th Cir.2005); see also Howard v. Bouchard, 405 F.3d 459, 467 (6th Cir.2005). The dissent would apply this standard. It could be questioned whether this court took a wrong turn in concocting modified AEDPA deference, as the standard looks indistinguishable from regular AEDPA deference and rests on a fiction about the state court's analysis. But if modified AEDPA deference makes any sense, it is only because we assume that the state court considered the issues with which it was confronted. Such an assumption would be completely unfounded when, as in this case, the state court does not simply render a decision without adequate explanation but instead actively applies a legal standard that no longer governs. See Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir.2001) ("[W]e can hardly defer to the state court on an issue that the state court did not address.”).

. The dissent's first preference is that we apply Roberts and afford AEDPA deference to the Michigan Court of Appeals's denial of Miller's claim. For the reasons described above, we disagree and apply Crawford. Seeing this, the dissent likewise analyzes the state-court decision under Crawford, and yet it applies AEDPA deference. This approach directly contravenes the Supreme Court's guidance in Terry Williams that "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.” Terry Williams, 529 U.S. at 405, 120 S.Ct. 1495. If Crawford applies, we are “unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's ‘contrary to’ clause,” and our review is de novo. Id. at 406, 120 S.Ct. 1495.

. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.” Id. at 822, 126 S.Ct. 2266.

. The dissent misses this point when it raises its trio of note-destruction hypotheticals. A person who writes a suicide note and then throws it into the trash, tears it up, or completely destroys it manifests actual intent not "to bear testimony against the accused.” *926 Cromer, 389 F.3d at 675. On those facts, we would not need to employ Cromer’s objective test. Here, however, there is insufficient independent evidence of Cassaday's actual intent: he may have seen the suicide note as completely separate from the briefcase materials or as part and parcel of them.
Nor is our analysis thwarted by the mathematical imprecision of the word "anticipate.” Even on the dissent's definition of "a significant likelihood, though perhaps short of 50%,” Dissent at 934 n. 7, we believe a reasonable person in Cassaday’s position would have anticipated that a suicide note confessing to actually committing the murder and implicating Miller, left atop a briefcase of accusatory evidence giftwrapped for the police, would be used against Miller.

. The dissent criticizes our citation of Johnson as inapt because that case involved an inadequate harmless-error argument made at the appellate level. We do not intend to say, however, that the State waived its argument due to inadequate briefing. Rather, the point is that given that inadequate briefing is enough to trigger waiver, certainly failure to raise an argument at all triggers waiver. The State’s failing is all the more egregious because it occurred below. See United States v. Abdi, 463 F.3d 547, 563 (6th Cir.2006) ("It is fundamental, and firmly established by Supreme Court precedent, that appellate courts generally are not to consider an issue brought for the first time on appeal.”). We see no reason, and the dissent provides none, why the general rule that failure to raise an issue below constitutes waiver should not apply to the respondent in a habeas case under § 2254. Moreover, we reject the dissent’s contention that the State raised harmlessness as to the suicide note by raising it as to the IMs. The harmless-error analysis would have differed with respect to each piece of evidence because each piece presented different information, was subject to a different level of impeachment, and played a different role in the State’s case. And if anything, the fact that the State had the wherewithal to raise harmlessness as to one piece of evidence gives rise to a fair inference that the State intended to waive the issue as to the other. United States v. Olano, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("[Wjaiver is the intentional relinquishment or abandonment of a known right.” (internal quotation marks omitted)). Thus, while Miller herself argued that the Confrontation Clause error was not harmless in her reply to the State's answer as a prophylactic measure, the district court had every reason to believe that the State had elected not to argue harmless error with regard to the suicide note.

. Were we to indulge the State’s request, we would be hard pressed to see the prosecution’s use of the suicide note in violation of the Confrontation Clause as harmless to the jury’s findings of guilt beyond a reasonable doubt. In particular, we find it significant that the prosecution relied heavily on the suicide note, invoking it during closing arguments to dispel the notion that Hutchinson may have killed Bruce Miller: “Now there has been some indication that ... Jerry isn’t the one who killed Bruce. That’s where the suicide note comes in.... Do not take the suicide note lightly.” J.A. at 1442 (emphases added). And critically, the trial court admitted the note pursuant to the residual hearsay exception, under which evidence must be “more probative on the point for which it is offered than any other evidence which the proponent could procure through reasonable efforts.” Mich. R. Evid. 804(b)(7); see also Dorchy v. Jones, 398 F.3d 783, 791 (6th Cir.2005) (invocation of the exception "makes the state’s present argument that [the] testimony was insubstantial both unpersuasive and inconsistent”). Under Dorchy, this evidentiary ruling would give us grave doubt that the suicide note’s admission was harmless. See Stapleton v. Wolfe, 288 F.3d 863, 867 (6th Cir.2002).